[No. C064930. Third Dist. Sept. 26, 2012.]

MOUNT SHASTA BIOREGIONAL ECOLOGY CENTER et al., Plaintiffs and Appellants, v.
COUNTY OF SISKIYOU et al., Defendants and Respondents;
ROSEBURG FOREST PRODUCTS CO. et al., Real Parties in Interest and Respondents.

**COUNSEL**

Donald B. Mooney for Plaintiffs and Appellants.

Thomas P. Guarino; Abbott & Kindermann and William W. Abbott for Defendants and Respondents.

Stoel Rives, Barbara A. Brenner and Stacy E. Gillespie for Real Parties in Interest and Respondents.

**OPINION**

**HULL, J.**—In November 2008, defendant Siskiyou County (County) approved a project to expand an existing wood veneer manufacturing facility owned by real party in interest Roseburg Forest Products Co. (Roseburg) in order to permit cogeneration of electricity for resale (Project). Plaintiffs Mount Shasta Bioregional Ecology Center (MSBEC) and Weed Concerned Citizens (WCC) filed a petition for writ of mandate against the County and

the County Board of Supervisors (Board) claiming approval of the Project and certification of the environmental impact report (EIR) for the Project violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). The trial court denied the petition.

Plaintiffs appeal, contending the EIR for the Project failed to include an adequate analysis of alternatives and failed to fully disclose, analyze and mitigate air quality, noise and water impacts of the Project. We agree there are some minor deficiencies and inaccuracies in the EIR for the Project but conclude they did not prejudice the environmental review process. We therefore affirm the judgment of the trial court.

FACTS AND PROCEEDINGS

In the mid-1980's, Roseburg purchased an existing wood products manufacturing facility on more than 300 acres adjacent to the City of Weed in an unincorporated area of the County and converted it into a softwood veneer processing operation. In 1996, Roseburg replaced eight boilers at the facility with a single, 120,000-pound-per-hour boiler.

In 2006, Roseburg sought approval of an expansion of the existing facility to accommodate a biomass-fueled cogeneration powerplant, whereby heat generated in the boiler could be used both for the veneer manufacturing process and for the generation of electricity for resale. The proposed Project "would include upgrading and retrofitting the existing power facility within the existing boiler house with a 15-megawatt steam-driven cogeneration system, including a General Electric turbine generator, a new exterior cooling tower, and a new electrical substation consisting of a 50-foot tall communications tower and control building." The Project equipment would be housed on less than one acre of the total 300-acre site, and the closest residence to the Project site would be approximately 250 feet away.

Much of the fuel for the Project will be generated at the facility and other manufacturing facilities from the bark and trim removed from logs used in the wood veneer production. Other fuel would come from forest management activities in the surrounding region, including community fuel breaks and firesafe thinning.

As stated in the EIR for the Project: "The overarching objective of the proposed project is to generate and sell excess power that is efficiently produced using sustainably-harvested renewable resources, offsetting the need for additional electricity generated from the burning of fossil fuels to support Roseburg's own facility operations. The purpose of the proposed project is also to aid the state power grid as a whole and help reduce regional energy

shortfalls, and meet state air quality attainment goals by reducing air pollutants and greenhouse gas emissions."

On December 6, 2006, the County Planning Commission (Planning Commission) approved a categorical exemption from CEQA and a conditional use permit for the Project. Nine days later, MSBEC and others appealed the Planning Commission's decision.

Roseburg later withdrew its application and submitted a new one. On June 29, 2007, the County issued a notice of preparation of an EIR for the Project.

On April 18, 2008, the County, as the lead agency, released for public review and comment a draft environmental impact report (DEIR) for the Project. Among other things, the DEIR estimates that, with implementation of the Project, approximately 15 truck trips per day, five days per week, with a peak of 27 trips per day during four months in the fall and winter, will be required to bring additional fuel to the facility. The DEIR also explains that "steam and resulting condensate (steam that has cooled and has converted back to a liquid state) would be processed in a closed-loop system, resulting in no off-site discharge of water product from the boiler or turbine."

Regarding the source for Project water, the DEIR states: "Water usage for Roseburg originates from Boles and Beaughton Creeks, both of which are adjudicated. Beaughton Creek serves a portion of the City of Weed, as well as a local water bottling plant. The dominant water use on site comes from Boles Creek, which is used for sprinkling the log decks through a recirculated sprinkler system. Additional uses include water for the log vats, dryer washing and boiler operation." The DEIR indicates current water consumption at the facility is 64,000 gallons per day (gpd) and the Project will require an additional 56,000 gpd. However, because this total of 120,000 gpd is below historic water usage during the 1990's of 123,000 gpd and below the current maximum allowable consumption by Roseburg of 1,467 million gallons per year (mgy), the DEIR concludes no mitigation of water impacts will be needed.

Regarding air quality issues, the DEIR indicates: "The proposed project will also include the installation of pollution control equipment. [County Air Pollution Control District] Rule 6.1 requires that best available control technology for [nitrogen oxides $(NO_x)$] be applied as part of the project. This will include selective non-catalytic reduction equipment to control emissions of $NO_x$ from the boiler. In addition, the project applicant has committed to installing filtration to control diesel particulate matter emissions from the fuel handling equipment (i.e., Bobcat and front-end loader)."

On the issue of Project noise, the DEIR indicates major information comes from two noise studies, one prepared by Environmental and Occupational

Risk Management (EORM) dated February 19, 2007 (the EORM Report), and one prepared by ExperShare dated July 27, 2007 (the ExperShare Report). The DEIR contains a table, "Table 3.7-2," summarizing 15-minute average sound levels at various locations in the community around the Project site, as reflected in the EORM Report. Another table, "Table 3.7-3," summarizes noise measurements from the ExperShare Report. According to the DEIR, the daytime noise measurements are below the County's daytime noise standard but above Weed's daytime noise standard in some locations, whereas all nighttime noise measurements are above Weed's nighttime noise standard.

The DEIR adopts a significance standard for Project noise that requires both that the new equipment increase noise in adjacent areas by at least 3.0 decibels (dB) and that overall noise in such areas exceeds the applicable County or Weed noise standard. Based on the EORM Report, the DEIR indicates predicted noise increases from the new Project equipment will be 0.5 A-weighted decibels (dBA), which represents an overall frequency-weighted sound level in dB that approximates the frequency response of the human ear. The DEIR also predicts noise increases from Project equipment and increased truck traffic together to be only 1.0 dBA. Hence, the DEIR concludes the noise impact from the Project will not be significant. Nevertheless, based on measurements reflected in the ExperShare Report for residences farther from the Project site, the DEIR indicates those residences could experience noise increases in excess of the 3.0 dB threshold and overall noise levels above the Weed nighttime standard. Therefore, the DEIR includes mitigation measure N-1, requiring Roseburg to cease deliveries before 7:00 a.m. or implement other measures to reduce the noise increase below 3.0 dB.

The comment period for the DEIR originally ended on June 2, 2008. However, it was extended to July 21, 2008. Many comment letters were received by the County expressing a wide range of environmental concerns.

A final environmental impact report (FEIR) was prepared in September 2008 which responded to the public comments. Regarding the Project description, the FEIR adds the following: "Treatments will be applied to the boiler building and the new equipment located within the building to control exterior noise. The potential treatments include but are not limited to adding additional mass to the building shell, installing acoustical absorption within the building, and installing enclosures around specific pieces of equipment." (Boldface omitted.)

Regarding noise measurements reflected in the EORM Report, the FEIR clarifies that the closest residence to the Project site would be 275 feet away

rather than 300 feet away. The FEIR therefore amends "Table 3.7-5" to reflect a predicted noise increase from Project equipment of 0.6 dBA and amends "Table 3.7-6" to reflect a predicted noise increase from Project equipment and truck traffic of 1.1 dBA.

Also as to Project noise, the FEIR adds to the summary of ExperShare noise measurements in Table 3.7-3 measurements taken from Woodridge Court, which measurements are slightly higher than the other measurements in the report. The FEIR also amends the statement that measured noise levels do not exceed the County's noise standard and adds: "There were several days at Union Street and Woodridge Court where sound levels exceeded 60 Ldn." (Boldface omitted.) "$L_{dn}$" is defined in the EIR as "[t]he energy average of the A-weighted sound levels occurring during a 24-hour period, with 10 dB added to the A-weighted sound levels occurring during the period from 10:00 p.m. to 7:00 a.m."

The FEIR also adds an explanation that, at the time the EORM Report was prepared, Roseburg had not identified all the Project equipment that will be located within the existing boiler building. However, because the building will provide substantial noise reduction, the noise analysis assumes there will be no meaningful contribution to noise levels from this unidentified equipment. Nevertheless, the FEIR adds mitigation measure N-2, which provides that if noise complaints are received and are attributable to the new Project equipment, Roseburg will retain a qualified acoustical consultant to measure noise levels. If it is determined the new equipment is causing a noise increase greater than 1.0 dB at the nearest residence, Roseburg will implement additional noise-reducing treatments around the equipment to reduce the noise increase below 1.0 dB.

On September 30, 2008, the Planning Commission certified the FEIR and approved the Project. In its resolution approving the Project, the Planning Commission found the DEIR was properly circulated, public comments were received and included in the FEIR, and the FEIR properly replied to the comments when necessary. The Planning Commission found: "The [FEIR] has been properly completed and has identified all significant environmental effects of the Project, and there are no known potential environmental effects that are not addressed in the [FEIR]." The Planning Commission further found: "The Project has been modified with mitigation measures to eliminate significant impacts or to reduce such impacts to a level of insignificance in all instances." The Planning Commission certified that the FEIR "has been completed in compliance with CEQA" and the FEIR "reflects the independent judgment of the Planning Commission."

MSBEC and others appealed the Planning Commission's decision to the Board. On November 13, the Board affirmed the Planning Commission's decision.

Plaintiffs initiated this action against the County and the Board seeking a writ of mandate compelling defendants to vacate their decision approving the Project and certifying the FEIR. As alleged in the petition, plaintiff MSBEC "is a non-profit organization working toward preserving biodiversity and the integrity of the environment in general in the Siskiyou County area." Plaintiff WCC "is an unincorporated association formed in June 2007 for the purpose of protecting the natural and cultural resources in and around the City of Weed." Both MSBEC and WCC are composed of persons whose economic, health, safety, and aesthetic interests will be injured if approval of the Project is not set aside pending full compliance with CEQA and all other laws. Plaintiffs allege various deficiencies in the DEIR and failure to provide adequate responses to public comments in the FEIR. Plaintiffs further allege defendants' findings regarding Project impacts, mitigation measures and alternatives are not supported by substantial evidence in the record and the Project approval conflicts with the County's general plan.

The trial court denied the petition, concluding the EIR's for the Project were sufficient under the circumstances. On March 16, 2010, the trial court entered judgment for defendants. Plaintiffs appeal.

DISCUSSION

I

*Standard of Review*

■ "[T]he Legislature intended [CEQA] 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] . . . An EIR is an 'environmental "alarm bell" ' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a

document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Id.* at p. 392.)

██ "Where an EIR is challenged as being legally inadequate, a court presumes a public agency's decision to certify the EIR is correct, thereby imposing on a party challenging it the burden of establishing otherwise." (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530 [78 Cal.Rptr.3d 1].) "[Public Resources Code s]ection 21168.5 provides that a court's inquiry in an action to set aside an agency's decision under CEQA 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' As a result of this standard, '[t]he court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.]" (*Laurel Heights, supra*, 47 Cal.3d at p. 392, fn. omitted.) We will not set aside an agency's approval of an EIR on the ground that a different conclusion would have been equally or even more reasonable. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley*).)

Our review in a CEQA case, as in other mandamus actions, is the same as that of the trial court. We review the agency's decision, not that of the trial court. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 [77 Cal.Rptr.3d 578, 184 P.3d 709].) Such review differs according to the type of error claimed. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 [53 Cal.Rptr.3d 821, 150 P.3d 709].) "Whether an 'agency has employed the correct procedures,' is reviewed 'de novo . . . "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation] . . . .' [Citation.] But an 'agency's substantive factual conclusions' are 'accord[ed] greater deference.' [Citation.] 'In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." [Citation.]' " (*Sierra Club v. City of Orange, supra*, 163 Cal.App.4th at p. 531.)

██ "When assessing the legal sufficiency of an EIR [as an informational document], the reviewing court focuses on adequacy, completeness and a

good faith effort at full disclosure. [Citation.] 'The EIR must contain facts and analysis, not just the bare conclusions of the agency.' [Citation.] 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citation.] Analysis of environmental effects need not be exhaustive, but will be judged in light of what was reasonably feasible." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1390–1391 [133 Cal.Rptr.2d 718].)

## II

### *Alternatives Analysis*

Plaintiffs contend the EIR in this matter contains an insufficient range of alternatives to the Project. "CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts. [Citations.] The CEQA Guidelines state that an EIR must 'describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . .' " (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1163, quoting Cal. Code Regs., tit. 14, § 15126.6, subd. (a); all further references to the CEQA guidelines in Cal. Code Regs., tit. 14, shall be referred to as Guidelines followed by the section number.)

However, an EIR need not consider every conceivable alternative to the project. (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1163.) " 'In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of "feasibility." ' [Citation.] CEQA defines 'feasible' as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' (Pub. Resources Code, § 21061.1; see also [Guidelines,] § 15364.) [¶] 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' ([Guidelines,] § 15126.6, subd. (a).) The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' (*Id.*, § 15126.6, subd. (f).) An EIR does not have to consider alternatives 'whose effect cannot be reasonably ascertained and whose implementation is remote and speculative.' (*Id.*, § 15126.6, subd. (f)(3).)" (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1163.)

An examination of an EIR's alternatives analysis must begin with the project's objectives, for it is these objectives that a proposed alternative must

be designed to meet. (*In re Bay-Delta etc., supra,* 43 Cal.4th at p. 1163; Guidelines, § 15124, subd. (b).) The DEIR identifies the following primary objectives of the Project: (1) "generate renewable energy that is produced in an efficient, economically viable and environmentally sound manner"; (2) "generate electricity in a closed-loop system through the utilization of the boiler's steam, which is fueled by a variety of sources, including the facility's wood by-products, Roseburg's timber lands, [United States Forest Service], and numerous small industrial suppliers all of which will supply clean, unaltered hog fuel"; (3) "offset Roseburg's own power needs by selling the excess green power for use in California"; (4) "aid the power grid as a whole and help reduce regional energy shortfalls"; (5) "assist California in meeting its legislated Renewable Energy Portfolio standards for the generation of renewable energy in the state; these standards require investor-owned utilities to purchase 20% of their power from renewable sources by 2010"; (6) "offset the need for additional electricity generated from fossil fuels, which emit more air pollutants than biomass-generated electricity, thereby assisting the state in meeting its air quality goals and reducing greenhouse gas emissions"; and (7) "reduce the need to conduct slash burns of local forest floor, forest thinning, and logging operation debris, which emits uncontrollable air pollutants."

The alternatives section of the DEIR states: "After completing an initial review of the proposed project along with all potential environmental impacts, the County identified a 'reasonable range' of alternatives, as defined by CEQA. There were not any alternatives identified that: 1) would meet most or all of the project objectives, 2) are considered feasible, and 3) would avoid or substantially reduce one or more potentially significant impacts of the proposed project. Several alternatives were considered but rejected from further consideration, as described below. Another alternative, a No Project alternative, was further evaluated and is described below."

The DEIR then identifies three alternatives that were considered but rejected. The first, a "Reduced Capacity Alternative," involves a smaller cogeneration facility sufficient only to supply Roseburg's onsite power needs. According to the DEIR, this alternative was rejected because it would not meet the objectives of an economically viable project, of putting green power into the California energy grid, and of helping meet California's 2010 green energy portfolio goals.

The second alternative, an "Alternative Boiler Location Onsite," was rejected because "there are no economic, operational or environmental benefits to" relocating the boiler, inasmuch as this would require installation of an additional boiler and greater air emissions. It would also eliminate the possibility of using steam generated in the veneer production process. And,

according to the DEIR, moving the existing facilities to a new location "would result in increased construction noise and air quality impacts, as well as additional construction truck and vehicle trips."

The third alternative, an "Alternative Location Offsite," involves construction of a new facility at Roseburg's facility in Oregon. This too was rejected as not meeting the Project's objectives. According to the DEIR, "[r]elocation of the cogeneration facility outside of California would require substantial new infrastructure construction, would result in an increase of air emissions resulting from hauling fuel from California to Oregon, and require additional coordination between the state of Oregon and the California Public Utilities Commission as to the logistics of wheeling power between states."

The only alternative considered in depth in the DEIR is the "No Project" alternative.

Plaintiffs contend the three alternatives considered and rejected during scoping cannot be counted for purposes of determining whether the EIR contained an adequate range of alternatives, and the remaining "No Project" alternative alone is not enough. According to plaintiffs, "CEQA does not allow an agency to reject every alternative during the scoping process as infeasible and then claim that the discussion of alternatives as infeasible met the requirement that [the] EIR described a range of potentially feasible alternatives to the project."

█ We agree alternatives considered and rejected during the scoping phase cannot be counted in determining whether the EIR has considered and analyzed a reasonable range of alternatives. CEQA requires the analysis of *feasible* alternatives. "The issue of feasibility arises at two different junctures: (1) in the assessment of alternatives in the EIR and (2) during the agency's later consideration of whether to approve the project. [Citation.] But 'differing factors come into play at each stage.' [Citation.] For the first phase—inclusion in the EIR—the standard is whether the alternative is *potentially* feasible. [Citations.] By contrast, at the second phase—the final decision on project approval—the decisionmaking body evaluates whether the alternatives are *actually* feasible. [Citation.] At that juncture, the decision makers may reject as infeasible alternatives that were identified in the EIR as potentially feasible." (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 981 [99 Cal.Rptr.3d 572].)

The EIR must include an analysis of the alternatives that were found during the scoping phase to be potentially feasible. Those rejected during the scoping phase as not potentially feasible are not counted.

Nevertheless, that does not mean an EIR is inadequate if all alternatives considered by the agency during the scoping phase are determined not to be

potentially feasible. Plaintiffs' argument presupposes an EIR indicating that no alternatives were found to be potentially feasible violates CEQA. However, as plaintiffs themselves acknowledge, there is no rule specifying a particular number of alternatives that must be included. "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." (*Goleta Valley, supra*, 52 Cal.3d at p. 566.)

Plaintiffs do not identify any alternatives that they contend are potentially feasible given the objectives of the Project. Instead, they argue the burden of identifying alternatives lies with the agency, citing *Laurel Heights*. However, *Laurel Heights* merely acknowledged the general obligation on the lead agency to identify alternatives and mitigation measures during the CEQA process. (*Laurel Heights, supra*, 47 Cal.3d at pp. 405–406.) But, as explained above, it is the appellants' burden to demonstrate inadequacy of the EIR. An appellant must therefore show the agency failed to satisfy its burden of identifying and analyzing one or more potentially feasible alternatives. An appellant may not simply claim the agency failed to present an adequate range of alternatives and then sit back and force the agency to prove it wrong.

In their reply brief, plaintiffs suggest the EIR should have considered an offsite alternative whereby the plant would be located closer to the trees used as a fuel source, thereby reducing hauling and attendant noise. However, plaintiffs make no attempt to show how such an alternative would have met most of the goals of the Project, would have been potentially feasible under the circumstances, or would have reduced overall environmental impacts of the Project.

Also in their reply brief, plaintiffs challenge the rationale used by the County to reject various of the alternatives as not potentially feasible. However, this argument presents nothing more than a difference of opinion. Plaintiffs do not contend, as they must, that there is no substantial evidence to support the County's rejection of the three alternatives as not potentially feasible.

Absent a showing that the EIR failed to include a particular alternative that was potentially feasible or that, under the circumstances presented, including only the Project and the "No Project" alternatives did not amount to a reasonable range of alternatives, plaintiffs' challenge to the alternatives analysis fails.

## III

### *Air Quality Impacts*

Plaintiffs challenge that portion of the EIR discussing the air quality impacts of the Project. They contend the EIR failed to identify the proper baseline of air quality emissions, failed to identify and mitigate the Project's air quality impacts, failed to analyze adequately the increase in $NO_x$ (nitrogen oxides) emissions from the Project, and failed to identify the maximum number of truck trips required by the Project and the air quality impacts associated with those trips. However, plaintiffs provide detailed argument and citations to authority only as to the one claim that the EIR uses the wrong baseline and consequently understates the Project's environmental impacts. We therefore need not address the other contentions. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834]; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

Guidelines section 15125, subdivision (a), reads in relevant part: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."

 "A long line of Court of Appeal decisions holds, in similar terms, that the impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis, rather than to allowable conditions defined by a plan or regulatory framework. This line of authority includes cases where a plan or regulation allowed for greater development or more intense activity than had so far actually occurred, as well as cases where actual development or activity had, by the time CEQA analysis was begun, already exceeded that allowed under the existing regulations. In each of these decisions, the appellate court concluded the baseline for CEQA analysis must be the 'existing physical conditions in the affected area' [citation], that is, the ' "real conditions on the ground" ' [citations], rather than the level of development or activity that *could* or *should* have been present according to a plan or regulation." (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 320–321 [106 Cal.Rptr.3d 502, 226 P.3d 985], fns. omitted.)

Plaintiffs contend the EIR in the present matter violates the foregoing rule by using *permitted* emission rates rather than *actual* emission rates at the existing facility. Plaintiffs argue actual emission rates at the facility have been

only 53 percent of allowable emission rates. Plaintiffs assert the County itself has acknowledged the maximum steam emission rate at the facility has averaged 112,000 pounds per hour, whereas the permitted rate is 120,000 pounds per hour. Thus, plaintiffs argue, "by the County's own admission, the 'historic' emissions are 93% of the permitted emissions." And because the EIR begins with the wrong baseline, plaintiffs argue, the EIR's analysis of Project impacts on air quality is likewise incorrect and misleading.

For much of plaintiffs' argument, including their assertion that actual emissions have been only 53 percent of permitted emissions, they rely solely on a letter prepared by Dr. Petra Pless that was submitted to the Board the day before the hearing on plaintiffs' appeal of the Planning Commission decision. This 16-page, single-spaced letter was accompanied by 101 pages of supporting literature. The Board allowed the Pless letter to be made part of the record but refused to consider it as evidence for purposes of plaintiffs' appeal. County hearing rules require that all documentary evidence be submitted at least five days before the hearing date.

Defendants have requested that we take judicial notice of County Resolution No. 03-92, adopted May 20, 2003, and setting forth County hearing rules. We grant the request. County hearing rules, rule 3(A)(2) requires that all documentary evidence be submitted at least five days before the applicable hearing.

 "[E]xtra-record evidence is generally not admissible in traditional mandamus actions challenging quasi-legislative administrative decisions on the ground that the agency 'has not proceeded in a manner required by law' within the meaning of Public Resources Code section 21168.5." (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) In the present matter, the Pless letter was not timely submitted and the Board refused to consider it for purposes of plaintiffs' appeal.

Plaintiffs argue defendants failed to challenge the Pless letter in the trial court. However, because we review the agency's decision, not that of the trial court, any failure to challenge the letter in the trial court is of no import.

Plaintiffs further argue defendants failed to try and exclude the Pless letter from the administrative record and in fact certified the letter as part of the administrative record. However, while the Board allowed the letter to be lodged in the administrative record, this was a meaningless act except insofar as it provided plaintiffs an opportunity to challenge exclusion of the letter from evidence before the Board. Plaintiffs have raised no such challenge. The Board excluded the letter from the evidence before it for consideration.

Absent error in this regard, the letter is not properly part of the record before us on review of the Board's decision.

Plaintiffs argue "[c]omments submitted after the close of the comment period on the [DEIR], but before the approval of the project, are part of the administrative record." However, the Pless letter was not submitted before approval of the Project. It was submitted just before the hearing on plaintiffs' appeal of such approval. And it was untimely in that regard.

Turning to the merits of plaintiffs' challenge to the baseline emissions, defendants disagree with the basic premise of plaintiffs' argument. They assert "[t]he baseline used to assess the air quality impacts was based on data representative of actual operations at the Existing Facility and not the maximum permitted or hypothetical rates." Defendants argue an emission rate of 120,000 pounds per hour was properly used as "a reasonable approximation" for the baseline steam production, because evidence in the record shows the existing facility has produced steam at an average rate of 112,000 pounds per hour.

Plaintiffs seize upon this latter argument to assert the County improperly relied on an approximation of emissions rather than actual emissions. However, plaintiffs cite nothing that would preclude an agency from arriving at an actual emission rate using an approximation method. Nor do they explain how use of an approximation that is nearly identical to actual usage would make the EIR somehow misleading and ineffective as an informational document.

At any rate, defendants argue plaintiffs are relying on overall steam emission rates when the real question for purposes of environmental analysis is the emission rates of the various pollutants at issue. Defendants assert, for example, the maximum permitted emission rate of $NO_x$ is 140 pounds per hour, or 3,360 pounds per day, whereas the EIR uses a significantly lower baseline $NO_x$ emission rate of 660 pounds per day. Plaintiffs do not argue the 660 pounds-per-day figure is not an accurate approximation of actual $NO_x$ emissions. Similarly, the EIR uses a baseline particulate emission rate of 46.1 pounds per day, whereas the permitted rate was 407 pounds per day. Again, plaintiffs do not challenge the 46.1 pounds per day figure as not being an accurate approximation.

But assuming the emission rates for $NO_x$ and particulates are based on an approximation of 120,000 pounds of steam production rather than 112,000 pounds of production based on measurements, this small discrepancy can hardly be considered significant, especially given the wide gap between the emission rates used in the EIR for $NO_x$ and particulates and the permitted

rates. In an action challenging an agency decision under CEQA, there is no presumption that an error was prejudicial. (Pub. Resources Code, § 21005, subd. (b).) In order to be prejudicial, an error or omission in the EIR must be such as would have precluded informed decisionmaking and informed public participation. (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650].) We cannot see on this record how a difference of 7 percent between actual and approximate emissions would have precluded informed decisionmaking or informed public participation.

Plaintiffs also contend the EIR included an incomplete description of the process to be used in reducing $NO_x$ emissions. The EIR states the process to be used is SNCR (selective noncatalytic reduction). According to plaintiffs, there are two types of SNCR, ammonia based and urea based, and the ammonia-based type uses anhydrous ammonia, which is a toxic substance. The EIR fails to identify which type of SNCR will be used. And, plaintiffs argue, if ammonia-based SNCR is to be used, the EIR fails to quantify the "ammonia slip" from the process.

Plaintiffs' arguments are again based on information in the Pless letter, which is not properly part of the record before us. Plaintiffs also cite a letter written by the State Air Resources Board (CARB), which states in part: "Ammonia will be used in the SNCR system for [$NO_x$] emission control; however it is unclear whether anhydrous or aqueous ammonia is proposed."

Defendants counter that an EIR need only include a "general description" of the Project and the EIR here satisfied that requirement. The Project description states: "The proposed project will also include the installation of pollution control equipment. [County Air Pollution Control District] Rule 6.1 requires that best available control technology for $NO_x$ be applied as part of the project. This will include selective non-catalytic reduction equipment to control emissions of $NO_x$ from the boiler." Defendants further argue "[t]he Project was never intended to use ammonia as the SNCR reagent." Instead, the Project will use urea. Defendants assert discussion of the reagent was therefore unnecessary because it was not needed for evaluating the Project's environmental impacts.

We agree with defendants the EIR description was adequate. Guidelines section 15124 reads in relevant part: "The description of the project shall contain the following information but should not supply extensive detail beyond that needed for evaluation and review of the environmental impact. [¶] . . . [¶] (c) A general description of the project's technical, economic, and environmental characteristics . . . ." Defendants assert there is no intent that the Project use ammonia as the reagent for reducing $NO_x$ emissions. Hence, there is no need to describe the environmental impacts from using ammonia.

Although plaintiffs argue the EIR should at least have identified whether ammonia or urea would be used, we note that nothing in the public comments submitted to the County on the DEIR requested such information or questioned the adequacy of the DEIR in this regard. As for the CARB comment letter, this was not submitted in connection with the adequacy of the DEIR but as to Roseburg's request for authority to construct.

Plaintiffs have failed to show any deficiency in the EIR's air quality analysis.

## IV

### Noise Impacts

Plaintiffs contend the EIR failed to disclose, analyze and mitigate the Project's various noise impacts. They argue the EIR did not identify the Project's cumulative noise impacts either in the City of Weed or from increased truck trips and did not disclose and analyze noise increases from the proposed generator. They further argue the County improperly failed to recirculate the EIR after appending two noise studies to it. Finally, plaintiffs argue there is no substantial evidence to support the County's finding that the Project's noise impacts are less than significant or that the adopted mitigation measures would reduce the Project's noise impacts to less than significant. We consider each of these arguments below.

### A. Direct Noise Impacts

Plaintiffs contend there is insufficient evidence to support the EIR's conclusion that Project noise impacts will be less than significant. Plaintiffs assert the EIR states noise increases from the cooling towers will be no more than 1.0 dBA, but an increase of 3.0 dBA is required for the increase to be perceptible and significant. However, plaintiffs argue, the EIR contains no 24-hour noise study, which they claim is necessary to determine if outdoor noise is already excessively loud. According to plaintiffs, the EIR instead relies on "just a few 15-minute noise level measurements." Plaintiffs assert the EIR and expert comments show the Project will in fact increase noise levels at nearby homes by 4.4 to 5.6 dB or more, which "would be audible to nearly everyone living nearby."

Defendants counter that the EIR relies primarily on the EORM Report but also considers the ExperShare Report in evaluating the Project's noise impacts. Defendants assert plaintiffs' arguments are based on the ExperShare Report, whereas the County was free to rely primarily on the EORM Report instead.

The DEIR specifies a significance threshold for both construction and Project noise. For Project noise, the threshold reads: "[O]peration of the new equipment included in the proposed project and related operations would increase noise at adjacent noise-sensitive uses by 3 dB (a barely perceptible increase) where existing noise at those uses exceeds the City of Weed and Siskiyou County General Plan Noise Element standard of 60 $L_{dn}$ or the City of Weed Noise Ordinance standards of 50 dBA (7:00 a.m. to 10:00 p.m.) and 40 dBA (10:00 p.m. to 7:00 a.m.)."

Plaintiffs assert the applicable noise threshold under the EIR does not require both an increase of at least 3.0 dB and an existing noise level that exceeds the applicable standard. They assert instead that either one or the other will suffice. However, plaintiffs rely for this argument on a reference to general state CEQA Guidelines, not the threshold established for this Project. Plaintiffs conveniently ignore the threshold language quoted in the preceding paragraph, which immediately follows the discussion of the general CEQA Guidelines.

The FEIR identifies a noise increase from operation of the Project equipment of 0.6 dBA and from combined equipment and truck deliveries of 1.1 dBA. Thus, according to the EIR, while the overall noise level might exceed nighttime noise standards, the increase in noise will be less than the 3.0 dBA threshold and therefore is not significant.

After acknowledging the foregoing, plaintiffs assert: "The EIR erroneously states that the ambient community noise levels are below that limit as the data in the tables demonstrate that some noise levels exceeded 60 dBA (Ldn)."

We are not quite sure what plaintiffs are talking about here, since the EIR is referring to the standard of noise *increases* (less than 3.0 dBA) rather than the standard for overall noise levels and readily acknowledges overall noise levels may exceed relevant noise standards. At any rate, the table to which plaintiffs refer indicates there were some noise measurements in the vicinity of the Project that exceeded 60 dBA. But plaintiffs are mixing apples with oranges here. The noise levels reflected in the table are average readings for 15-minute periods at various times during the day ($L_{eq}$) whereas the value to which plaintiffs refer, 60 dBA ($L_{dn}$), is an average for a 24-hour period. The table shows only that, at times, the noise level exceeds 60 dBA. It does not show a 24-hour average exceeding 60 dBA.

In a footnote, plaintiffs assert the EIR states the noise levels reflected in Table 3.7-3 (the ExperShare measurements) are below the County's outdoor noise standard of 60 $L_{dn}$, yet data in the table show some noise levels in

excess of 60 $L_{dn}$. However, this ignores the correction in the FEIR, which acknowledged that "[t]here were several days at Union Street and Woodridge Court where sound levels exceeded 60 Ldn." (Boldface omitted.)

Plaintiffs next assert the EIR contains no 24-hour noise test which, according to plaintiffs, "is required to determine if the outdoor yard[s] of these homes are already excessively loud." However, plaintiffs cite as their sole support for this 24-hour requirement a letter to the Board from Dale LaForest, a Project opponent. In that letter, LaForest asserts the County's general plan limits outdoor noise in residential areas to 60 dB(Ldn). However, while a measurement expressed in terms of Ldn specifies a 24-hour average, there is nothing to suggest such average must be determined by a 24-hour measurement rather than periodic sampling during a 24-hour period.

Plaintiffs next assert: "The EIR instead relies inaccurately upon just a few 15-minute noise level measurements of 53.9, 53.9 and 51.9 dBA($L_{eq\text{-}15\text{-}min}$), which, if proportionately representative of sound levels over 24 hours, when averaged and converted, also exceeds 60 dBA($L_{dn}$)." Plaintiffs do not explain how they take three 15-minute intervals with average noise levels less than 60 dBA and turn them into an overall 24-hour average exceeding 60 dBA. Perhaps it is the definition of $L_{dn}$ contained in the EIR, which reads: "The energy average of the A-weighted sound levels occurring during a 24-hour period, with 10 dB added to A-weighted sound levels occurring during the period from 10:00 p.m. to 7:00 a.m." Under this definition, nighttime noise measurements would be increased by 10 dB before computing an average. However, plaintiffs fail to explain the source of the noise level measurements or when they were taken. At any rate, as explained above, the significance level adopted for the EIR requires *both* an overall noise level exceeding the applicable standard *and* an increase of at least 3.0 dBA.

Plaintiffs next take issue with the EIR's indication that the noise increase will not exceed 1.0 dBA. Plaintiffs assert both the EIR and expert comments demonstrate the increase will instead be as much "as 4.4 to 5.6 dB or more." Plaintiffs cite the following discussion in the DEIR: "Noise measurement results indicate that there would be conditions where ambient noise is less than 52.7 dBA. Measurements conducted by Expershare indicate that ambient noise can be as low as 44.3 dBA in the residential area south of the project site. If this value is used as the ambient noise level, the sum of the operational noise level (46.7 dBA) and the ambient noise level would be 48.7 dBA. This represents a 4.4 dB increase over the ambient noise level. Because the equipment and truck noise level would exceed the nighttime noise standard of 40 dBA under these conditions and result in an increase in excess of 3 dB, this impact is considered to be significant."

First, plaintiffs' argument ignores the correction in the FEIR that the predicted overall noise increase would be 1.1 dB, not 1.0 dB. At any rate, we fail to see what plaintiffs find objectionable about the fact the EIR identifies a noise increase of 1.1 dB based on measurements from one noise study (the EORM Report) but also indicates a greater increase in noise could be experienced in locations farther from the Project site based on the results of another study (the ExperShare Report). Plaintiffs do not dispute the accuracy of the EORM study. The EIR did exactly what plaintiffs would have it do—it disclosed that greater noise increases might be experienced as a result of the Project.

As for plaintiffs' assertion that noise increases could be as high as 5.6 dB, they cite as support a letter from Dale LaForest in which he asserts "the noise from this project's new cooling tower, when added to the noise from the existing veneer facility, will total 66.8 db(A)Ldn, considerably louder than County or City of Weed maximum allowable noise limits." Nowhere does LaForest identify a noise increase of 5.6 dB. Furthermore, the County was not required to accept the veracity of LaForest's representations.

### B. *Mitigation Measures*

The FEIR identifies two mitigation measures for noise impacts, N-1 and N-2.

Mitigation measure N-1 states: "If the County receives complaints concerning noise from truck deliveries before 7:00 a.m.[,] Roseburg shall conduct noise measurements at the affected location to determine if the new equipment and truck deliveries are causing the 15-minute median sound level to increase by 3 dB or more. If it is determined that the new operations are increasing noise by 3 dB or more, Roseburg shall cease delivery operations before 7:00 a.m. or implement other measures to limit the increase in noise to 3 dB or less."

Mitigation measure N-2 states: "If noise complaints are received and are directly attributable to the new equipment after completion of the project, Roseburg will retain a qualified acoustical consultant to measure exterior noise produced by the new equipment to confirm that the project-related increase in noise is less than 1 dB as measured in terms of one-hour Leq and daily Ldn values at the nearest residence. If it is determined that the new equipment is resulting in an increase in noise that is greater than 1 dB at the nearest residence, Roseburg shall implement at the direction of the County additional noise-reducing treatments to limit the project-related increase in noise to 1 dB or less at the nearest residence. The potential treatments include but are not limited to adding additional mass to the building shell, installing

acoustical absorption within the building, and installing enclosures around specific pieces of equipment." (Boldface omitted.) "$L_{eq}$" is defined as "[t]he average of sound energy occurring over a specified period. In effect, $L_{eq}$ is the steady-state sound level that in a stated period would contain the same acoustical energy as the time-varying sound that actually occurs during the same period."

In its findings of fact in support of its resolution certifying the FEIR and approving the use permit for the Project, the Planning Commission found both that overall noise levels at some locations could exceed the nighttime noise standard of 40 dBA and that the increase in noise from the Project could exceed the 3.0 dBA threshold. However, the Planning Commission also found "[e]limination of truck deliveries before 7:00 a.m. would cause the increase in noise to be less than 3 dB" and implementation of mitigation measure N-1 would reduce the noise impact to less than significant.

Plaintiffs argue the foregoing findings are not supported by substantial evidence. They argue: "The success of a mitigation measure cannot be based upon complaints being received and subsequent tests. Some timid neighbors might suffer the lack of peace and quiet rather than be identified as opposing a major employer." Plaintiffs provide no legal support for this argument and we are aware of none. On the contrary, there is every reason to believe a mitigation measure calling for further mitigation efforts in the event individuals directly impacted by a project complain of increased noise would go directly to the heart of the matter. At any rate, this " 'court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. [Courts] have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.' " (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 646 [20 Cal.Rptr.2d 228].) Our standard of review is the deferential substantial evidence test. (*Id.* at pp. 638–639.) In the present matter, plaintiffs have not shown substantial evidence is lacking for the designated mitigation measure.

Plaintiffs nevertheless argue that, in already noisy areas, a noise increase of less than 3.0 dBA may be significant, yet mitigation measure N-1 would permit such an increase. Plaintiffs also assert mitigation measure N-1 is too vague and provides no benefit to those living along the Project's haul routes.

Regarding the 3.0 dBA threshold for noise increases, this is not so much an attack on the mitigation measure as an attack on the overall decision of the County to adopt a significance standard requiring such an increase. As explained earlier, the DEIR adopted a significance standard for the Project

that requires both an increase of at least 3.0 dBA and an overall noise level above the applicable city or County standard. The DEIR indicates a noise increase of 3.0 dBA would be "barely perceptible." Plaintiffs do not challenge this assessment, and this court is in no position to judge whether a noise increase of 3.0 dBA would be significant for purposes of CEQA analysis. This was a judgment call more properly left to the County.

Nor do we perceive anything vague in the mitigation measure. If a complaint is received, Roseburg must conduct measurements to determine if the threshold is exceeded at the indicated location. If so, changes must be made to bring the noise level below the threshold. Because the concern here is with the noise level, the fact the mitigation measure leaves it to Roseburg to decide how best to reduce the noise should be of no concern.

Finally, as to the fact the mitigation measure provides no benefit to those living along the Project's haul routes, we are aware of no rule that a particular mitigation measure must address all possible impacts. Mitigation measure N-1 is expressly designed to address noise impacts to properties adjacent to the Project site. As for plaintiffs' complaints regarding noise along major haul routes, we address those later in this decision.

As for mitigation measure N-2, section E(4)(b) of plaintiffs' opening brief is entitled "The County's Findings Regarding Mitigation Measure N-2 are not Supported by Substantial Evidence." However, in the body of this section, plaintiffs assert a plethora of other arguments and very little about mitigation measure N-2. They argue that, because homes near the Project site are already exposed to noise levels above 60 dB, an increase of even 1.0 dB might be considered significant. They further assert both mitigation measures considered together "would allow already beleaguered homes to be exposed to up to 4 dB of additional Project noise before any mitigation or noise restriction would occur." They assert the DEIR "omitted the Messer noise study" and neither of the noise studies included measured noise at the closest homes. In addition, plaintiffs assert the EIR presented no data on the Project's turbine generator noise and therefore presented no mitigation for such noise. According to plaintiffs, neither the EORM Report nor the ExperShare Report was prepared by an acoustical engineer, and the EORM Report merely assumed turbine noise from inside the building would be adequately muffled. Finally, plaintiffs assert the 3.0 dB threshold for noise increases, where homes are already exposed to excessive noise, is inconsistent with *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1123 [85 Cal.Rptr.3d 50] (*Gray*).

Appellate briefs must state each point raised under a separate heading. (Cal. Rules of Court, rule 8.204(a)(1)(B).) If not, the points raised need not be considered. (*Heavenly Valley v. El Dorado County Bd. of Equalization* (2000)

84 Cal.App.4th 1323, 1346 [101 Cal.Rptr.2d 591]; *Live Oak Publishing Co. v. Cohagan* (1991) 234 Cal.App.3d 1277, 1291 [286 Cal.Rptr. 198].) In this instance, some of the points plaintiffs assert in this section are dealt with in more detail elsewhere in their opening brief. We shall address them later. The remaining arguments are forfeited.

As for the one argument raised in the heading to section E(4)(b), plaintiffs assert simply that "there is a lack of evidence as to whether [mitigation measure N-2] will be effective and reduce any impacts to less than significant." Plaintiffs provide no further detail to support this argument and, therefore, it too is forfeited.

### C. *Generator Noise Impacts*

Plaintiffs contend the EIR failed to discuss and analyze noise from the Project's turbine generator. In finding G.1 in support of its resolution approving the EIR, the Planning Commission indicated: "At the time of the assessment conducted by EORM, Roseburg had not identified the other equipment specified to be used for this project including the steam turbine generator, condenser and related equipment. This equipment will be located within an enclosed structure (the existing boiler building) and noise-reducing housing and enclosures will be located around the turbine and other equipment located within the building. Because of the substantial noise reduction that will be provided by the building enclosure and housings within the building, the noise analysis assumed that there would be no meaningful contribution to noise levels at the nearest residences from this equipment."

Plaintiffs argue the County's failure to discuss and analyze noise from the generator was a prejudicial abuse of discretion. However, beyond merely asserting this to be so, plaintiffs provide no argument or supporting evidence or authorities. In particular, plaintiffs make no attempt to refute the finding that the housing around the generator will reduce the noise from the generator to insignificance. What plaintiffs do argue is that the County's finding that nighttime noise from the Project would add less than 3.0 dB relies on noise level measurements submitted by ExperShare which, according to plaintiffs, were from homes located approximately 4,000 feet from the Project site. However, what this has to do with the alleged failure to include noise measurements from the generator is unclear. Plaintiffs' argument regarding the lack of generator noise analysis is therefore forfeited.

### D. *Cumulative Noise Impacts in Weed*

In addition to direct environmental effects, an EIR must discuss the "significant cumulative effects" of a proposed project. (*Laurel Heights, supra,*

47 Cal.3d at p. 394.) Significant cumulative effects include those that are "individually limited but cumulatively considerable." (Guidelines, § 15065, subd. (a)(3).) "The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects." (Guidelines, § 15355, subd. (b).) However, "[t]he mere existence of significant cumulative impacts caused by other projects alone shall not constitute substantial evidence that the proposed project's incremental effects are cumulatively considerable." (Guidelines, § 15064, subd. (h)(4).)

"Assessment of a project's cumulative impact on the environment is a critical aspect of the EIR." (*Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1025 [68 Cal.Rptr.2d 367].) " 'One of the most important environmental lessons evident from past experience is that environmental damage often occurs incrementally from a variety of small sources. These sources appear insignificant, assuming threatening dimensions only when considered in light of the other sources with which they interact.' " (*Kings County Farm Bureau v. City of Hanford, supra,* 221 Cal.App.3d at p. 720, quoting Selmi, *The Judicial Development of the California Environmental Quality Act* (1984) 18 U.C. Davis L.Rev. 197, 244, fn. omitted.)

Where the cumulative impacts of a given project are not significant, "the EIR shall briefly indicate why the cumulative impact is not significant and is not discussed in further detail in the EIR." (Guidelines, § 15130, subd. (a)(2).)

Plaintiffs contend that, despite the fact the Project will have cumulatively significant noise impacts in the City of Weed, the EIR in this instance indicated otherwise. The DEIR states: "[I]mplementation of the proposed project is predicted to result in direct noise impacts that are either less than significant or less than significant with implementation of Mitigation Measure N-1. A significant cumulative noise impact is considered to exist in the project area because City of Weed noise ordinance standards (50 dBA daytime, 40 dBA nighttime) are already exceeded as the result of several existing sources in the area, including roadway traffic, existing industrial operations at the Roseburg facility and other nearby industrial sources, and freight trains. However because the increase in noise associated with the implementation of the proposed project and the proposed noise mitigation is predicted to be small (1 dBA or less), the project's contribution to the existing cumulative noise impact is not considered to be cumulatively

considerable." In other words, although there is already a significant cumulative noise impact in the Project area, it is predicted the Project will add no more than 1.0 dB to the total, which the EIR determines to be cumulatively insignificant.

Plaintiffs take issue with the foregoing assessment. They argue the new cooling towers for the Project will expose nearby homes to noise levels at least 4.0 dB higher than existing nighttime levels and public comments indicated the overall daytime noise level would increase to 66.8 dB. According to plaintiffs, even with a "relaxed" threshold of 3.0 dB for noise increases, the cooling tower will have cumulatively significant noise impacts on nearby homes. Further, plaintiffs argue, a 3.0 dB threshold is "inappropriately too large" where homes are already exposed to excessive noise. Plaintiffs assert the Project's two noise mitigation measures will allow noise increases of up to 3.0 dB from the cooling tower and up to 1.0 dB from the turbine generator, or a total of up to 4.0 dB, before any action must be taken by Roseburg to quiet the noise.

We are not persuaded. First, plaintiffs' claim that the two noise mitigation measures will permit a 4.0 dB increase, 3.0 dB from the cooling tower and 1.0 dB from the turbine generator, is not supported by the record. The two mitigation measures do not apply to different Project equipment and do not establish cumulative noise thresholds. Where the noise increase from *all* Project equipment exceeds 1.0 dB at any time, mitigation measure N-2 kicks in. Mitigation measure N-1 comes into play only when, during nighttime hours, the noise increase from both Project equipment and truck traffic exceeds 3.0 dB. Once this 3.0 dB threshold for increased equipment and truck noise is reached, mitigation is required, regardless of whether the equipment threshold of 1.0 dB has also been reached. During daytime hours, mitigation is required once the 1.0 dB threshold is reached for Project equipment alone.

We note that, presumably, during daytime hours, combined equipment and truck noise increases can exceed 3.0 dB, or even 4.0 dB, without triggering a mitigation measure, as long as the noise increase from Project equipment alone does not exceed 1.0 dB.

Defendants acknowledge the EIR found a significant cumulative noise impact already exists in the Project area due to noise from several sources, including traffic and the present Roseburg facility. Defendants argue, however, that the EIR properly concluded an incremental increase from the Project of 1.0 dBA, as reflected in the DEIR, or 1.1 dBA, as reflected in the FEIR, is not cumulatively significant.

In *Gray*, the plaintiffs challenged the county's certification of an EIR and approval of a quarry project on agricultural land. (*Gray, supra*, 167

Cal.App.4th at pp. 1103–1104.) Regarding noise impacts, the DEIR for the project indicated increased noise at all but one residence would be no more than 2.1 dB. And because the DEIR used a 3.0 to 5.0 dB threshold, the EIR concluded the 2.1 dB increase was not significant. (*Id.* at pp. 1122–1123.) As for the one residence, the county concluded the noise impact was significant but unavoidable. (*Id.* at p. 1123.) The DEIR contained no cumulative noise impact analysis.

The Court of Appeal concluded the lack of a cumulative noise impact analysis under these circumstances was fatal to the EIR. The court explained: "We agree with Appellants that there is no single noise increase that renders the noise impact significant. [Citation.] Here, the Madera County General Plan noise element establishes that for residential uses affected by transportation noise sources (offsite traffic in this case), 60 dBA Ldn (day-night average noise level) is the maximum acceptable noise level. All of the sites tested for State Route 41, however, show that existing traffic noise levels are already in excess of this amount. Thus, the EIR should consider whether the cumulative noise impact would be significant when increases of up to 2.1 dBA are added to the existing noise level. For example, even though a 2.1 dBA noise in isolation will not be noticeable, when added to an already high noise level, it could cause a tipping point of noise problems for the general public. The EIR, however, does not analyze this issue and merely concludes that it would not be significant because '[i]t is generally recognized that an increase of at least 3 dB is usually required before most people will perceive a change in noise levels.' This bare conclusion cannot satisfy the requirement that the EIR serve as an informational document." (*Gray, supra,* 167 Cal.App.4th at p. 1123.)

The EIR in the present matter does not suffer from the same malady identified in *Gray.* The DEIR identifies a 3.0 dB threshold of significance for noise impacts of the Project in isolation but then uses a reduced 1.0 dB threshold for purposes of assessing cumulative impacts. Plaintiffs do not contend otherwise.

However, plaintiffs do contend mitigation measure N-1 permits a noise increase of 3.0 dB before any actions must be taken, which flies in the face of the DEIR's assertion that "the increase in noise associated with the implementation of the proposed project and the proposed noise mitigation is predicted to be small (1 dBA or less) . . . ." Plaintiffs apparently contend the EIR should have analyzed whether a noise increase of 3.0 dBA amounts to a significant cumulative impact.

But the question presented here is not whether the mitigation measures permit a noise increase that might be cumulatively significant but

whether there is substantial evidence to support the statement in the DEIR that "the project's contribution to the existing cumulative noise impact is not considered to be cumulatively considerable." In this regard, the FEIR predicts an overall noise increase from the Project of only 1.1 dB. Thus, even though the EIR contains a mitigation measure that is not triggered until noise increases reach 3.0 dB, the drafters apparently did not believe this would ever occur. Although plaintiffs contend there is evidence to show a greater noise increase than 1.1 dB from the Project, they do not assert the record lacks substantial evidence that the predicted noise increase will be no more than 1.1 dB. A difference of opinion on the facts is not a valid basis for overturning approval of an EIR. (*Goleta Valley, supra*, 52 Cal.3d at p. 564.)

### E. *Cumulative Noise Impacts from Trucks*

Plaintiffs contend the EIR fails to disclose the cumulative impacts of Project truck traffic noise on homes along major haul routes that are already exposed to significant noise levels. Plaintiffs assert the EIR erroneously assumes a truck speed of 10 miles per hour (mph). Plaintiffs also claim Roseburg officials have indicated trucking can reach over 200 trips per day on occasion, yet the EIR fails to analyze noise impacts at such levels. Plaintiffs assert homes along some of the Project's haul routes are already exposed to noise levels above the County's maximum standard of 60 dB. According to plaintiffs, for such homes, "the addition of this Project's heavy fuel-hauling trucks may create a cumulatively significant noise impact."

Regarding delivery truck noise impacts, the DEIR reads: "With implementation of the proposed project new sources of biomass fuel would be acquired by retrieving currently unused biomass from local forest floor cleanup, forest thinning, and logging operations. Currently fuel receiving occurs from 6:00 a.m. to 5:00 p.m. five days a week with approximately 3.3 truckloads per day. With implementation of the project it is estimated that there would normally be about 15 truck trips per day five days a week with as many as 27 truck trips per day during a peak four month period in the fall and winter. These trucks will access the project site via a short section of Angel Valley Road off of U.S. 97 that leads to the logyard back entrance access road on the northeast side of the project site. This access road is 1,500 to 2,000 feet from the nearest residences. However, once trucks are onsite they could be as close as about 300 feet from the nearest residence."

The DEIR continues: "To assess the impact of increased truck deliveries it is assumed that up to 3 trucks per hour traveling at 10 mph would access the site. This corresponds to 6 total truck trips per hour entering and leaving the facility. The Federal Highway Administration Traffic Noise Model (Version

2.5) was used to calculate the predicted noise level at the nearest residences located 300 feet south of the project site. The predicted noise level is 44.2 dBA. . . ."

The DEIR then combines noise from truck traffic with Project equipment noise to come up with a projected noise increase at the Project site.

It is readily clear the analysis of trucking noise impacts in the DEIR is limited to traffic in and around the Project site. Hence, the 10 mph representation in the EIR of which plaintiffs complain refers to trucks traveling in and around the Project site, not trucks traveling along major haul routes away from the facility, as plaintiffs apparently assume.

As authority for their assertion that Roseburg officials have indicated truck trips could on occasion exceed 200 per day, plaintiffs site a comment letter submitted by Dale LaForest stating: "Heavy trucking increases associated with this project can amount to hundreds of extra truck trips per day according to project proponents." However, the source of this representation is not disclosed by LaForest or plaintiffs. As such, it has no evidentiary value.

In response to public comments on the DEIR, the FEIR states: "With regard to the effect of project-related trucking on traffic noise generated on U.S. 97, an analysis was conducted that clearly indicated that the project would have no meaningful effect on noise generated by traffic on U.S. 97. The most recent data on highway truck volumes published by Caltrans (Caltrans 2006) indicates that the average daily traffic volume on U.S. 97 is 12,100 and that 10.3% of this volume is trucks. As stated on page 3.7-9 of the [DEIR], the project is predicted to add up to 27 truck trips per day. The addition of 27 truck trips per day to 12,100 trips on U.S. 97 would in theory increase traffic noise by less than 0.1 dB. This means that the additional trucks would have no meaningful effect on noise generated by traffic on U.S. 97."

Plaintiffs contend the EIR failed to consider noise increases along the entire primary truck route or along other truck routes that might be used to bring fuel to the facility. They assert homes along those routes are already subject to noise levels exceeding applicable standards. However, the only homes plaintiffs mention as the basis for this contention are those in Weed near the Project site. Thus, they provide no basis for requiring an analysis of trucking noise away from the facility. Nor do plaintiffs cite anywhere in the public comments where this issue was ever raised. In order to raise a challenge to an EIR, the precise ground for noncompliance must have been presented to the public agency by any person during the public comment period or prior to the close of the public hearing on the project. (Pub.

Resources Code, § 21177, subd. (a); *Sierra Club v. City of Orange, supra,* 163 Cal.App.4th at p. 535.) This exhaustion requirement is jurisdictional. (*Sierra Club,* at p. 535.)

Plaintiffs contend the EIR's assertion that offsite trucking noise increases will be insignificant given the small number of truck trips added by the Project is "based on unprovided calculations and data and the unsupported and unsubstantiated assumption that such truck noise emissions will not be significant because trucks would only be driven at 10 mph on various haul roads." However, plaintiffs' reference to 10 mph is, as explained above, a red herring, and we find nothing unsupported in the FEIR's discussion of why 27 additional truck trips on U.S. Highway 97, given the current load on that route, would not cause a meaningful increase in noise.

Plaintiffs next argue the present matter is "nearly identical" to *Gray* in that the EIR in *Gray* failed to analyze the cumulative impacts of a 2.1 dB noise increase and the EIR here failed to analyze the cumulative impacts of a noise increase of 3.0 dB, which would be permitted under the proposed mitigation measures. However, plaintiffs are again comparing apples to oranges. The 3.0 dB threshold for mitigation measure N-1 relates to truck and equipment noise increases around the Project site, not along haul routes. Because the EIR found no significant noise impact along haul routes, there was no occasion for a mitigation measure in that regard. Interestingly, later in their opening brief, plaintiffs themselves recognize this discrepancy in their argument by asserting "Mitigation Measure N-1 only pertains to on-site truck traffic."

Plaintiffs also argue the EIR places no limits on the number of truck trips per day, specifying only an average of 27. Plaintiffs once again assert, without evidentiary support, that "Roseburg's representatives publicly disclosed that they sometimes receive wood shipments in large quantities after forest fires when over 100 truck trips per day have been counted." The EIR states there will be an average of 27 truck trips per day, and plaintiffs cite no *evidence* in the record to refute this.

F. *Failure to Recirculate the EIR*

Plaintiffs contend the County improperly failed to recirculate the EIR after "significant new noise reports" were added to it. They argue the two reports—the EORM Report and the ExperShare Report—should have been included in the DEIR or the FEIR should have been circulated for further public comment once those reports were appended to it. Plaintiffs assert that not only did the DEIR exclude the ExperShare Report, but it "contradicts

Expershare's conclusion of noise significance, selectively edits out its conclusions, and fails to provide detailed noise data." Plaintiffs further assert the EORM Report was not released to the public until after the close of public comment.

If significant new information is added to an EIR after completion of the public comment period, the lead agency must issue a new notice and initiate a new comment period. (Pub. Resources Code, § 21092.1.) " 'Significant new information' requiring recirculation include, for example, a disclosure showing that: [¶] (1) A new significant environmental impact would result from the project or from a new mitigation measure proposed to be implemented. [¶] (2) A substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted that reduce the impact to a level of insignificance. [¶] (3) A feasible project alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the significant environmental impacts of the project, but the project's proponents decline to adopt it. [¶] (4) The [DEIR] was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded. . . ." (Guidelines, § 15088.5, subd. (a).)

In *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99 [104 Cal.Rptr.2d 326], the DEIR for a residential development project recognized that a significant water supply issue existed. Following issuance of the FEIR, the applicant notified the county it had obtained riparian water rights on another parcel of property and that, in the event mitigation of water use impacts for the project was necessary, the applicant could reduce pumping on this alternate parcel as an offset. (*Id.* at pp. 112–113.) The Court of Appeal concluded identification of this alternate water source late in the CEQA review process required recirculation of the EIR and further public comment. (87 Cal.App.4th at p. 131.)

In the present matter, defendants acknowledge the two noise reports were not added to the EIR until the FEIR. Nevertheless, they argue, the DEIR contained a summary of the findings in both reports and expressly identified both reports. They further argue the reports were available for public review. Thus, according to defendants, inclusion of the two reports with the FEIR did not amount to adding *significant* new information.

Under the heading "Existing Noise Levels," the DEIR states: "Detailed studies to characterize existing ambient noise conditions in the community surrounding the project site have been conducted by EORM (EORM 2007) and Expershare (Expershare 2007). Refer to those studies for detailed information on ambient noise conditions. The following summarizes the key

information from these two studies." The DEIR then presents Table 3.7-2 and indicates it "summarizes 15-minute average sound levels measured by EORM in the community surrounding the project site." Following Table 3.7-2 is Table 3.7-3, which summarizes noise measurements from the ExperShare Report.

The DEIR then states: "The noise measurements conducted by EORM and Expershare are quite consistent. For example[,] the daytime measurements at Position ES-3 in the range of 50.7 to 53.4 dBA are consistent with the 53.5 dBA measurement at Position E10. The daytime measurements in the range of 50.0 to 56.0 dBA at Position ES-1 are consistent with the 51.3 measurement at Position E3. As indicated in Table 3.7-3 sound levels measured at night are only slightly lower than those measured during the day. The $L_{dn}$ values reported in Table 3.7-3 are below the county's outdoor noise level standard for residences of 60 [$L_{dn}$]. At some locations the City's daytime noise ordinance standard of 50 dBA is exceeded. The City's 40 dBA nighttime standard is exceeded at all locations where nighttime measurements were taken."

Later, under the heading "Impact N-1: Exposure of Adjacent Noise Sensitive Land Uses to Operational Noise," the DEIR states: "EORM has evaluated noise expected to be generated by the operation of the new equipment to be added to the facility. This evaluation is based on source-level information provided by the equipment manufacturer and standard attenuation factors. Table 3.7-5 summarizes the predicted noise level from the equipment at the nearest residential uses 300 feet south of the project site." This is followed by Table 3.7-5, which lists a predicted noise increase from Project equipment of 0.5 dBA. After describing the proposed increase in truck traffic to the facility, the DEIR includes Table 3.7-6, which predicts an overall noise increase from the Project and truck traffic of 1.0 dBA.

The DEIR then explains that, although the overall noise level would exceed the Weed nighttime standard of 40 dBA, the increase is below the 3.0 dBA significance threshold set for the Project and is, therefore, determined to be "less than significant." However, the DEIR goes on to explain that measurements reflected in the ExperShare Report show that in some locations away from the Project site, where the current noise level is lower but nevertheless above the Weed nighttime standard, the noise increase would exceed the 3.0 dBA threshold. The EIR states, "this impact is considered to be significant."

Plaintiffs take issue with the County's decision to include a summary of the two noise reports in the DEIR rather than the reports themselves. Plaintiffs argue "[t]he [DEIR's] summary of the EORM report that was

withheld did not allow the public the opportunity to independently evaluate the Project's noise impacts." However, in support of their claim that the DEIR should have included the entire reports, plaintiffs cite a portion of the DEIR that does not discuss the EORM Report and a portion of a comment letter submitted by Dale LaForest, who complained that the DEIR fails to notify the public where the two noise studies can be found for public review. That letter states Guidelines section 15050, subdivision (b), requires that the reports be included in the EIR.

Guidelines section 15050, subdivision (b), does not address incorporation of reports in an EIR. We assume LaForest meant instead Guidelines section 15150, which permits incorporation of other documents by reference in an EIR or negative declaration. Subdivision (b) of section 15150 reads: "Where part of another document is incorporated by reference, such other document shall be made available to the public for inspection at a public place or public building. The EIR or negative declaration shall state where the incorporated documents will be available for inspection. At a minimum, the incorporated document shall be made available to the public in an office of the lead agency in the county where the project would be carried out or in one or more public buildings such as county offices or public libraries if the lead agency does not have an office in the county."

The short answer to LaForest's comment is that the DEIR did not attempt to *incorporate* the two noise studies by reference. Although the DEIR mentioned those reports, it did so only by way of explaining the source for some of the data discussed. Had the County incorporated the two noise studies into the DEIR, those studies would have become part of the document, and the later physical appending of those reports to the FEIR would have added nothing.

Plaintiffs assert the FEIR "incorrectly states 'both reports were . . . available,' " when they were not. However, the portion of the FEIR cited by plaintiffs does not so state. Plaintiffs also assert: "The County withheld the EORM report from the public because the County never made it available to the public at the County's Planning office when access to all Project documents were [*sic*] publicly requested." However, again plaintiffs cite only the comment letter from Dale LaForest, who asserted that, while at the planning department offices on July 1, 2008, he "specifically sought the EORM's noise study but did not find it there."

In their reply brief, plaintiffs assert the EORM Report was not provided "in spite of PRA requests for inspection of all Project documents." We assume by this plaintiffs mean a request under the California Public Records Act (Gov. Code, § 6250 et seq.; CPRA). However, as support, they cite page 18 of a

27-page letter from Dale LaForest to Terry Barber, the County's director of planning, discussing a myriad of subjects relating to the Project. However, on page 18 there is no mention of a CPRA request for documents or, for that matter, any blanket request for documents.

Plaintiffs claim the County released the EORM Report to the public only after the close of the public comment period. As support, they cite a July 22, 2008, e-mail from Sandy Roper to Dale LaForest which states: "This morning I received a message that you had requested a copy of the EORM Noise Study for the [DEIR] for Use Permit No. 07-05 for the Roseburg project. I have attached a copy of the EORM Noise Study, per your request. If you have any other questions, please let me know."

The fact LaForest did not find the noise reports at the planning department on July 1, 2008, and the County provided the EORM Report to LaForest on July 22 in response to a request by him hardly proves that the report was not available earlier. At most, this proves the report was not at the planning department at the time.

Plaintiffs next assert the DEIR "selectively edited out evidence of an existing significant noise impact created by the current mill operation." In particular, plaintiffs argue, the DEIR omitted noise measurements collected for Woodridge Court, which showed the existing facility sometimes exceeds local noise standards. However, as support for this argument, plaintiffs cite a single page from the FEIR, which contains sound graphs for noise levels on Union Street, which the FEIR identifies as "one of the highest measured in the study." There is no mention of Woodridge Court. The graphs do show noise levels exceeding the 60 dBA threshold. However, we note the DEIR also showed a range of $L_{dn}$ measurements on Union Street from the Exper-Share Report that exceeded 60 dBA. Other than this, plaintiffs cite as support comments submitted by Dale LaForest. Plaintiffs do not cite the ExperShare Report itself. The closest they come is to cite the title page of both noise reports. However, they apparently leave it to this court to dig through the reports to find the information allegedly omitted by the DEIR. Furthermore, plaintiffs cite nothing to establish that the information from the ExperShare Report included in the DEIR was "selectively edited" rather than being representative of the entire report.

Admittedly, the FEIR added noise measurements from Woodridge Court that had not been included in the DEIR. Those measurements are slightly higher than the other measurements in the ExperShare Report. The FEIR also amended the statement that noise levels do not exceed the County's noise standard and added: "There were several days at Union Street and Woodridge Court where sound levels exceeded 60 Ldn." (Boldface omitted.) However,

since the DEIR also acknowledged there were noise measurements that exceeded the County standard at other locations, this information added very little to the overall picture.

Incorporation of the two noise studies into the FEIR did not involve a new significant environmental impact, a substantial increase in the severity of an environmental impact, or the rejection of a feasible project alternative or mitigation measure. Nor is it claimed the DEIR was "so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5, subd. (a)(4).) The DEIR simply failed to include all noise information and all measurements found in the two noise studies.

Incorporation of the two noise studies in their entirety rather than in summary fashion is not the type of new information requiring recirculation of the EIR. "Recirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR." (Guidelines, § 15088.5, subd. (b).) "The requirement in Public Resources Code section 21092.1 that an EIR be recirculated when 'significant new information' is added is not intended 'to promote endless rounds of revision and recirculation of EIR's. Recirculation is intended to be [the] exception, rather than the general rule.' " (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra*, 87 Cal.App.4th at pp. 133–134.)

V

*Water Quality Impacts*

Plaintiffs contend the EIR fails to include an adequate description and analysis of the Project's impacts to water and hydrology in the area. They further argue some of the EIR's conclusions regarding water usage are not supported by substantial evidence. We address these contentions hereafter.

A. *Disclosure of Impacts on Water Supplies*

Under the heading "Water Supply," the DEIR states: "Water usage for Roseburg originates from Boles and Beaughton Creeks, both of which are adjudicated. Beaughton Creek serves a portion of the City of Weed, as well as a local water bottling plant. The dominant water use on site comes from Boles Creek, which is used for sprinkling the log decks through a recirculated sprinkler system. Additional uses include water for the log vats, dryer washing and boiler operation. . . ."

Under the heading "Impacts to Water Supply," the DEIR reads: "The historic average annual water use at the Roseburg Forest Products facility during the 1990s was approximately 45 million gallons per year (mgy) peaking during the summer months. This is equivalent to approximately 123,000 gallons per day (gpd) (45 mgy/365 days). The existing facility has an annual average daily consumption of 64,000 gpd. The proposed project would be expected to have an annual average daily consumption of 56,000 gpd, which again peaks during the summer period. The total post-project average daily consumption would be equal to 120,000 gpd (Hultgren pers. comm.). As a result, the proposed project would be within the range of historic water consumption. [¶] Currently, Roseburg's maximum allowable water usage (not including the City of Weed lease of 2 [cubic feet per second (cfs)]; Table 3.5-1) is 6.22 cfs, or about 1,467 mgy. Project water consumption is below the current maximum allowable. Because Roseburg's usage is significantly below maximum available under the Shasta River Adjudication, and because post-project water consumption is less than historic water consumption, this impact is considered to be less than significant. No mitigation is required." (Fns. omitted.)

Plaintiffs contend the EIR does not contain an adequate description of the Project's impacts on water supplies of downstream users. They also assert the County did not prepare a "water balance study," and the EIR contains little useful information on water balance. Plaintiffs point out the EIR contains no information regarding available streamflow or the extent to which Roseburg's water rights may be contractually committed to others and contains inadequate information about dry-season conditions either before or after implementation of the Project. Plaintiffs argue the fact future water usage may be within the historic range is misleading, because historic usage at the facility was nonconsumptive, whereas water usage for the Project will be "entirely consumptive." Plaintiffs further argue the EIR failed to discuss and analyze additional new water uses, including a water bottling plant.

Beyond simply raising the foregoing arguments, plaintiffs provide no legal or factual basis for this court to conclude the EIR was deficient for the reasons indicated. For example, we are left to guess at what a "water balance study" might be or why it was necessary in this instance.

Regarding consumptive versus nonconsumptive uses, plaintiffs cite as their sole support the public comments of two individuals. In one, Brian Stewart stated: "While future usage may or may not be within the historic range during critical months [citation], it also *seems likely* that historic use was nearly all <u>non-consumptive</u> (watering of log decks, washing of logs, etc.), while cooling tower usage will be <u>entirely consumptive</u>." (Original underscoring, italics added.) In the other comment, David Webb asserted that a more

complete assessment of water usage and water rights is needed for the EIR. Webb continued: "This is especially important if *as seems likely* Roseburg's historic rights were essentially non-consumptive, and this new use will *apparently* be consumptive since there is to be no discharge." (Italics added.) It is clear in both instances the authors were merely speculating about current and future water use. This is not evidence of a change in water usage.

In responses to comments, the FEIR states: "The proposed project does not include a change in the type or point of location of water use. The water will continue to be diverted from the same point of diversion, will be used at the same place (the Roseburg facility in Weed) and water use will continue to be year round with peak periods. The type of use will continue to be municipal and industrial. Roseburg's water use has and will continue to be a consumptive use. There will be no change in water use from the historical practice, all of which is consistent with Roseburg's adjudicated water rights." Plaintiffs cite no evidence to refute the foregoing.

Lastly, as to plaintiffs' claim the EIR failed to discuss and analyze additional new water uses, including a water bottling plant, we note the DEIR contains a description of the Nestlé bottling plant and the sources of water for the plant, which sources are different from those for the Project. The DEIR further states: "The proposed Nestlé Water Bottling Project in McCloud is anticipated to divert up to 1,600 acre feet per year with an instantaneous rate that will not exceed 1,250 gallons per minute. The proposed project will not affect the Nestlé Water Bottling Project because the Nestlé Project is located 25 roadway miles southeast of the Roseburg site, and the water for the Nestlé Project will be diverted from Intake, Upper Elk, and Lower Elk Springs. Therefore, there would be no cumulative hydrology, water quality, or water supply impacts associated with the proposed project."

In both their opening and reply briefs, plaintiffs complain that the EIR failed to mention another new source of water use, a Crystal Geyser bottling plant. However, plaintiffs cite nothing in the record regarding this purported new water user or any other new projects. They have therefore failed to establish any error in this regard.

### B. *Disclosure of Water Use and Discharges*

Plaintiffs contend the EIR's discussion of water usage is inadequate because it fails to include mention of water discharges from the Project's cooling tower and instead indicates the cooling tower will be a closed loop with no discharges. However, what plaintiffs actually present is a difference of opinion as to how the cooling tower is anticipated to operate.

The DEIR states: "A new component, the proposed cooling tower, has been partially constructed (all but the fan shrouds) to cool the water that flows

through to proposed condenser's water tubes. The cooling tower would have two cells (measuring 60 feet by 42 feet, with an elevation of about 43 feet for both cells combined) mounted inside the water containment basin. The cooling tower would be constructed of fiberglass, and during its operation, it could pump 15,840 gallons per minute (gpm) of cooling water through the proposed condenser. At the proposed cooling tower, the water would be sprayed onto drift eliminators inside the cooling tower structure to reduce moisture drift. The water would then be gravity fed through a heat exchanger, also located on the inside of the cooling tower structure. From there, the water would flow into a self-contained sump for recirculation. Other than losses to evaporation, the cooling tower is a closed-loop system."

Plaintiffs assert Roseburg's own representatives admitted during the hearing on plaintiffs' challenge to the Project that there will be water discharged from the cooling tower. However, the transcript pages they cite state just the opposite. At page 2175 of the administrative record, Roseburg's representative, Ellen Porter, stated: "[T]he cooling tower and the other new portions of the project that might have some water associated with it are actually going to be reused in other parts of the process. And so, as a result, you'll be able to use it as makeup water in other areas. There will be no discharge associated with this project."

At page 2212, Porter indicated: "[A]ll if not most of the water within that system continually recirculates, goes initially through the treatment, through the boiler, we'll have steam lines, you know, throughout the veneer facility, or that go through the turbine, those are, those are captured in condensate tanks, pumps, and then it'll, it'll be fed back into the pipes into the boiler. That is essentially a closed-loop system. [¶] They're, they're—with every boiler you're going to have some solids that, that will fill to a concentration that's high enough to where you'll have to, have to discharge very, very small amounts of water. That's called boiler blowdown. [¶] And those, the boiler blowdown that's associated with the current boiler is within our, our discharge permit. The blowdown that will be associated after the, after the turbine is installed, we're going to reuse that in another, another part of the process. [¶] So it's not going to discharge off-site. Most of it will be captured within that system or will be used within, within the production facility."

Elsewhere in the hearing transcript, Robin Styres, another Roseburg spokesperson, stated: "There will be a waste stream from the [reverse osmosis] process, but that stream will be utilized in the remaining mill process."

The foregoing testimony supports the assertion in the EIR that the cooling tower operations will be a closed loop in the sense that no water will be

discharged. As solids in the circulating water reach a particular concentration, the water will be diverted to other uses in the system. There will be no discharge of water into the environment.

Plaintiffs nevertheless argue Roseburg's consultants indicated the cooling tower would require 230,400 gallons of "make-up" water every day. They cite a November 27, 2006, memorandum from Chad Darby of Golder Associates to Ellen Porter in which Darby states: "[T]he cooling tower will have a recirculation rate of 16,000 gallons per minute. Makeup water will be acquired from groundwater at a rate of approximately 160 gallons per minute. The makeup water will replace evaporation losses, drift (water droplets exhausted from the cooling tower) and blowdown water."

The foregoing does not quantify how much, if any, of the makeup water will be to make up for blowdown losses. Plaintiffs assert that, "[b]ased on industry cooling tower estimates[,] approximately 25% of the water is lost to 'blow down' water." However, the pages they cite in the record do not so state. At any rate, the fact new water may be needed to replace blowdown water does not mean there will be discharges of blowdown water, inasmuch as Roseburg testified water with high concentrations of particulates will be utilized elsewhere in the process.

Plaintiffs' argument regarding blowdown water boils down to a difference of opinion as to whether there will be any water discharges from the Project. Plaintiffs simply question the veracity of Roseburg's representations that water taken from the cooling tower with high particulate concentrations will be used elsewhere in the process. This was for the County to decide. We will not set aside an agency's approval of an EIR on the ground that a different conclusion would have been equally or even more reasonable. (*Goleta Valley, supra*, 52 Cal.3d at p. 564.)

C. *Evidentiary Support for Water Usage*

As described above, the DEIR describes historic water usage at the Roseburg facility during the 1990's at approximately 45 mgy, or 123,000 gpd. It further indicates the existing facility uses 64,000 gpd, and the Project will use an additional 56,000 gpd, for a total of 120,000 gpd, which is within the historic range.

Plaintiffs contend there is no evidentiary support for the foregoing representations. Further, they argue, the estimates of water usage are refuted by the memorandum from Roseburg's consultant, quoted above, that the Project alone will require 160 gallons of makeup water per minute, or 230,400 gpd.

Defendants make no attempt to refute the foregoing argument. Instead, they assert the EIR correctly determined the Project would have no significant impact on water supply. They further assert the Planning Commission "consistently responded to comments on this issue." However, it is readily apparent the Planning Commission did not respond to the indicated water usage discrepancy. In response to a public comment about the 230,400 gpd of makeup water, the FEIR states: "As part of the air quality technical analysis, site-specific emission factors were developed based on the recirculation rate. The value of total dissolved solids, organic additives, and a drift loss (0.005%) associated with recirculation water were included. These values were used to estimate emissions of criteria pollutants and air toxics. [Citation.]" The Planning Commission made no attempt to refute the 230,400 gpd figure. Defendants cite nothing in the record to support the EIR's representation of much lower water usage.

 Assuming the correctness of the 230,400 gpd figure mentioned by the consultant, plaintiffs cite nothing to suggest this level of water usage will have a significant environmental impact. It is not enough simply that the EIR misstated an aspect of a proposed project. "Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. ([Pub. Resources Code,] § 21005, subd. (b).) . . . '[A] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Association of Irritated Residents v. County of Madera, supra*, 107 Cal.App.4th at p. 1391.) The fact the overall water usage on the Project may have been understated in the DEIR would not appear to preclude informed decisionmaking or informed public participation unless the increased usage would have a significant environmental impact. We will not presume that to be the case here. (Pub. Resources Code, § 21005, subd. (b).)

D. *Evidentiary Support for Water Source*

As noted above, the DEIR states the source for water utilized in the Project will be Boles and Beaughton Creeks, for which Roseburg has adjudicated water rights. Plaintiffs argue this is not supported by the record which, they claim, contains conflicting evidence about the source of Project water. According to plaintiffs, "[g]iven that the Project is being built on a Superfund site, the source of water is critical information for the public and other agencies."

The record does not support plaintiffs' contention. Plaintiffs claim Roseburg's representative, Ellen Porter, testified the source of Project water would be "a spring." (Boldface omitted.) As support, they do not cite testimony by

Porter but a letter written to the Board by Anne Marsh, a Project opponent, who indicated Porter testified "the source of water is a 'spring.' " At any rate, as discussed hereafter, the fact Porter may have identified the source as a spring does not conflict with the DEIR.

Plaintiffs next claim Roseburg's consultant indicated the source of makeup water would be "groundwater." They cite as support the November 27, 2006, memorandum from Chad Darby to Ellen Porter, quoted above, in which Darby further stated: "The groundwater used as makeup water will contain some mineral content." Plaintiffs acknowledge Porter explained that Darby's memorandum was in error in this regard, but assert she failed to give any further details. Again, however, plaintiffs rely solely on the representations of Anne Marsh in her letter to the Board, and not on any testimony or written statements by Porter.

At the Planning Commission hearing on the Project, Terry Barber, the director of the County's public health and community development department, explained that no groundwater would be used for the Project. Later, Porter explained that Roseburg would be using "spring water" for the Project. Springwater is water that naturally percolates to the surface from an underground aquifer to become the source of a river or stream. (Wikipedia, The Free Encyclopedia <http://en.wikipedia.org/wiki/ Spring_(hydrology)> [as of Sept. 26, 2012].) The spring itself is the point where the water reaches the surface. (*Ibid.*) Hence, springwater is surface water, not groundwater. The DEIR explains that both Beaughton and Boles Creeks originate primarily with springs. At the hearing before the Board, Barbara Brenner, special counsel to Roseburg on environmental issues, reiterated no groundwater would be used in the Project.

VI

*Project Description*

Plaintiffs contend the EIR contains an inadequate and inaccurate Project description, because it fails to mention blowdown water, the contaminants such water will contain, the type of containment that will be used for the water, how the water will be treated or used, and the ultimate location for its discharge. However, as previously discussed, the record supports the conclusion in the EIR that there will be no water discharges. Plaintiffs' argument is premised on an assumption that there must be some water discharges, inasmuch as concentrations of contaminants will continue to build up in the water as portions evaporate during operation of the Project. However, this ignores Roseburg's representations that this high-concentration water will be

used in other processes within the facility and will not be discharged. Plaintiffs' argument is simply a difference of opinion as to whether this representation is true.

DISPOSITION

Having found no prejudicial defect in the EIR or the CEQA review process, we affirm the judgment of the trial court denying plaintiffs' petition for writ of mandate. Defendants and real parties in interest are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

Raye, P. J., and Hoch, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 30, 2013, S206918. Kennard, J., was of the opinion that the petition should be granted.