Filed 8/19/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SAVE OUR ACCESS–SAN GABRIEL MOUNTAINS, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> WATERSHED CONSERVATION AUTHORITY, <br><br> Defendant and Appellant. | B303494 <br><br><br> (Los Angeles County <br> Super. Ct. No. 18STCP02984) |
| SAVE OUR ACCESS—SAN GABRIEL MOUNTAINS, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> WATERSHED CONSERVATION AUTHORITY, <br><br> Defendant and Appellant. | B307701 |

APPEALS from a judgment and a postjudgment order of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge.  Judgment reversed with directions to enter a new

judgment denying petition for writ of mandate in its entirety; order awarding attorney fees reversed.

Leibold McClendon & Mann and John G. McClendon for Plaintiff and Appellant in B303494 and for Plaintiff and Respondent in B307701.

Richards, Watson & Gershon and Ginetta L. Giovinco for Defendant and Appellant.

—————————————————

## SUMMARY

This case concerns environmental review of an improvement project in the Angeles National Forest. Defendant Watershed Conservation Authority (WCA or defendant) certified the environmental impact report (EIR) for the project under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (Further unspecified statutory references are to the Public Resources Code.)

Plaintiff Save Our Access–San Gabriel Mountains challenged defendant's certification of the EIR. The EIR addressed the usual extensive range of potential impacts on the environment, on biological resources, cultural resources, water quality, air quality, and more. This appeal addresses only three points: a reduction in available parking; the fact the EIR did not analyze multiple alternatives to the project, instead analyzing a single "no project" alternative; and alleged conflicts with land management plans.

The trial court rejected plaintiff's claims that CEQA required defendant to consider additional project alternatives, and that the project was inconsistent with applicable land use plans, but issued a writ of mandate requiring defendant to

2

"articulat[e] and substantiat[e] an adequate parking baseline" for the project, and to "reassess[] the significance of the impacts resulting from the . . . project's parking reduction." The court found those two issues were severable and the rest of defendant's project activities do not violate CEQA.

Both parties appealed from the judgment. The trial court later awarded plaintiff attorney fees, and defendant appealed from that order. We conclude the trial court erred in its analysis of the parking issue and should have denied plaintiff's petition in its entirety. This conclusion requires reversal of the attorney fee order as well.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Project and Its Genesis

We describe at some length the history of this wilderness recreation and preservation project. We quote extensively from environmental reports, the comments of consultants, members of the public and members of defendant's board, the contentions of the parties, and the findings of the trial court, so as to provide a thorough historical context for our legal analysis.

The project under review is called the San Gabriel River Confluence with Cattle Canyon Improvements Project. The project is in the Angeles National Forest, the first national forest in California, created by Presidential proclamation in 1892. In October 2014, President Barack Obama designated 342,177 acres of the Angeles National Forest and 4,002 acres of the San Bernardino National Forest as the San Gabriel Mountains National Monument. The monument was established "to expand recreational access, to increase investments in restoring landscapes, and to protect resources important to the history and heritage of the United States."

3

The project site is within the monument and consists of 198 acres along a 2.5-mile stretch of the East Fork of the San Gabriel River. It encompasses "the riverbed, public roads . . . , and all existing recreational facilities within the project site." It is among the most popular recreation areas for weekend use, and "heavy use combined with the lack of facilities has resulted in the degradation of the area," including damage to vegetation, soil compaction and erosion, stream alteration, high levels of litter deposition, and water quality impairment due to excessive trash. The project was proposed "to better manage the heavy recreation use while balancing the need for long-term resource protection."

The project was developed over several years of collaboration between the Angeles National Forest and defendant.[1] "The intent is to provide recreational improvements and ecological restoration to address resource management challenges with a focus on reducing impacts along the most heavily used section of the river."[2] Proposed enhancements

---

[1] Defendant is a joint powers agency of the San Gabriel and Lower Los Angeles Rivers and Mountains Conservancy and the Los Angeles County Flood Control District. Defendant is the lead agency responsible for preparing an EIR under CEQA. The Angeles National Forest is responsible for preparing an environmental impact statement under the National Environmental Policy Act. A joint statement was prepared under the direction of both lead agencies to satisfy their respective requirements.

[2] The EIR further states: "The purpose and need for the project is to: [¶] • Provide recreation facilities and infrastructure that are high quality, well-maintained, safe, and accessible to visitors. [¶] • Shift and concentrate recreational use to certain areas in order to minimize adverse effects over a

4

"include the development of new picnic areas, pedestrian trails, river access points and upgrades to existing facilities, improvements to paved and unpaved roadways, parking improvements, restrooms and refuse disposal improvements, restoration of riparian and upland vegetation communities . . . and implementation of a Forest Closure Order to prohibit overnight camping."

After public scoping meetings in November 2016, a draft EIR was prepared and circulated in November 2017 for public comments.

## 2. The Draft EIR

We describe the draft EIR as it relates to the parking reduction, the focus of defendant's appeal. Additional facts relevant to plaintiff's claims concerning project alternatives and land use conflicts are included in our legal discussion of those claims.

### a. Existing parking conditions

The draft EIR described the existing limited number of designated parking spaces and the widespread practice of parking in undesignated areas.

---

broader area. [¶] • Promote stewardship of public land by providing quality and sustainable recreation opportunities that result in increased visitor satisfaction. [¶] • Allow for better management of the recreation resources in the forest. [¶] • Improve riparian habitat conditions in certain areas and make progress toward enhancing stream habitat conditions by restoring vegetation, minimizing invasive plants and noxious weed presence, and developing management strategies to regulate access."

5

"Currently, designated parking (paved area with delineations) within the project site consists of 15 parking spaces at the Oaks Picnic Area and 33 parking spaces at the East Fork Day Use Parking trailhead. The remainder of the parking occurs in undesignated areas along the shoulders and any wide spot along the side of the road. During busy summer weekends, almost all available designated and undesignated parking spots are used. During the 2013–2014 seasons, the WCA measured the average use during the weekends between Memorial Day and Labor Day was 273 vehicles per survey day. There are an estimated 417 total parking spaces available, both designated and undesignated, in the project area (Blue Green Consulting, 2017). This is a rough estimate based on aerial photography and does not include parking that would be prohibited by current signage. The estimate also does not take into account the addition of parking spaces located at the old fire station site, and the removal of spaces located at the East Fork Day Use Parking Trailhead to accommodate new facilities. [¶] Parking capacity in undesignated areas will fluctuate depending on how visitors park and the type of vehicles they arrive in. Some parking efficiencies are achieved in undesignated areas when groups arrive in multiple cars and double or triple park. On major summer holiday weekends (Memorial Day, Independence Day, and Labor Day) parking capacity in the project site is reached early in the day."

b. **The proposal to formalize parking spaces and prevent parking in undesignated areas**

The draft EIR proposed "to formalize parking spaces by adding features such as pavement, stripes, and signage. Undesignated parking areas would be blocked with boulders and

'no parking signage' would be installed." The draft EIR described the proposed "parking spaces available" (as relevant here) this way:

"Once fully implemented, the maximum parking available . . . will be 270 car spaces and 3 bus spaces. During the 2013–2014 seasons the WCA measured the average use during the weekends between Memorial Day and Labor Day was 273 vehicles per survey day. With the reduction in parking there would be an impact to the number of visitors able to park in the project site. [¶] The displacement that does occur would likely lead to increased use at other areas with similar amenities within the region. It is assumed that displaced visitors would be dispersed across the region as they find substitute activities."

The draft EIR further explained the changes, separately for the lower canyon and the upper canyon.[3] In the lower canyon, "[i]n current conditions, there are 15 designated parking spaces available. WCA field observations found that on average over the summer weekends, the vehicle count for this area was 131 parked cars. With implementation of [the project], this would change to 169 designated spaces available." In the upper canyon, "[i]n current conditions, there are 33 designated parking spaces available. WCA field observations found that on average

---

[3] The lower canyon includes "the Confluence Area, Junction Area and Oaks Picnic Area to the south project boundary." The upper canyon is "the area north of the Cattle Canyon Bridge to the northern project boundary and includes the East Fork Trailhead Parking, East Fork Scenic Overlook, Coyote Flat, and Heaton Flat areas."

over the summer weekends, the vehicle count for this area was 142 parked cars.  With implementation of [the project], this would change to 101 designated spaces available."

In both locations, "[d]uring peak use hours, some visitors will not be able to find a place to park and will likely either find a substitute activity or location to participate in their desired activity."

### c.    Environmental consequences

The draft EIR found the project's impact on recreation was less than significant.  Specifically:

"The project would not increase the use of existing neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated."  The draft EIR cited the most recent National Visitor Use Monitoring (NVUM) survey that found more than half the responding people said if they were unable to visit the national forest, they would travel elsewhere in the region to participate in their desired activity.[4]  The draft EIR also found

---

[4]    The draft EIR explained:  "Based on 2011 NVUM studies for the [Angeles National Forest], 52 percent of survey respondents indicated that they would travel somewhere else to participate in their main activity if they were unable to visit the national forest.  From that group of respondents, 51 percent of them would be willing to travel up to 25 miles to participate in the activity and an additional 31 percent would be willing to travel up to 50 miles to participate in their primary activity.  Brown and Richter noted the following about visitors to the lower canyon area[:]  'relatively high numbers of visitors reside in zip codes located along the I-605 corridor, then fanning out across eastern Los Angeles County (south of the 60 freeway) into downtown Los Angeles, and then the south/southeastern parts of

the project "would not include recreational facilities or require the construction or expansion of recreational facilities which might have an adverse physical effect on the environment."  The draft EIR concluded:  "The potential for substantial physical deterioration of other recreational facilities in the region as a result of the project would be minimized through implementation of PDM [project design measures] REC-1 and PDM-REC 2. Impacts would be less than significant."  These project design measures included avoiding construction during weekends and major holidays to reduce the likelihood of displacement of the recreating public, and a public notification plan to inform the public of possible area closures and other available recreation opportunities.

In comparing the proposed project with the "no project" alternative, the draft EIR stated:  "[O]peration of the project would result in a reduction in parking, thus potentially impacting the number of visitors able to drive single-occupancy vehicles to the project site.  This could potentially result in a slight increased use in other recreational facilities or areas with similar amenities within the region, but it is assumed that this would be dispersed

_____

Los Angeles County' (Brown and Richter p. 5).  Brown and Richter's study indicated that visits to the upper canyon area generally are from a larger geographic area.  The project site is located approximately 16 miles or half hour drive from the Interstate 210 the closest freeway.  It is assumed that visitors to the project site would likely drive to another location to participate in their desired activity if they were unable to participate in their activity within the project site."

9

across the region as individuals find substitute activities. . . . Project implementation would result in concentrated recreational use centered around the river access points (as opposed to existing dispersed recreation throughout the river). Crosswalks, designated parking spaces, river access points, and designated picnic areas would provide a safer environment for visitor access."

In concluding the project was the environmentally superior alternative, the draft EIR stated the project's concentration of recreational uses around planned river access points would "reduc[e] human impacts (i.e., erosion, water quality, trash, habitat trampling) to the environment. Placement of restrooms, parking areas, and trash bins would reduce impacts of visitors to the area compared to existing conditions. In addition, operational effects of the project would promote utilization of formal trailheads, designated parking lots, crosswalks, and closure of informal trails. [The project] would improve access and safety of recreational users, while managing sustainable recreation."

### 3. The Final EIR: Responses to Comments

The final EIR in Appendix J contains defendant's response to every comment on environmental issues raised during the public review period. Appendix J includes "master responses" on several issues, including traffic and parking, and project alternatives. The master responses "are intended to provide comprehensive discussion in response to select sets of issues that received multiple comments. They are intended to provide clarification and refinement of information presented" in the draft EIR.

In the traffic and parking category, commenters asked for clarification of the baseline parking condition and expressed opinions regarding the reduction in the number of parking spaces; the need for a traffic/parking study; reliance on the 2014 Brown and Richter survey to estimate the average use of 273 vehicles in the project area, which some people considered outdated; and limitations to public access.

Defendant's response reiterated the existing parking conditions as described in the draft EIR (48 designated and 369 undesignated spaces), and stated that "[d]uring busy summer weekends, almost all available designated and undesignated parking spots along the road shoulders—some of which are unsafe and many of which occur in areas that are currently signed as 'no parking'—are used."  Defendant noted that parking capacity in undesignated areas "will fluctuate depending on how visitors park (i.e., perpendicular, parallel, or double or triple park) and the type of vehicles they arrive in."[5]

Defendant acknowledged that the number of current parking spaces "was determined using aerial photographs from one peak day in 2014," and "[s]ince this only captures one peak day, it is possible for actual peak day visitorship to be greater

---

[5]     Defendant observed the Brown and Richter 2014 survey (measuring average use during summer weekends and finding 273 vehicles per survey day) was, at the time of the EIR notice of preparation, "the best available science/information and most relevant data collected in the project area specifically for this project," and "was provided to various commenters and will be made public[ly] available."

than 417 on certain days." The data showed "the demand to access the area is considerably greater than the designated parking currently available," and the project is "designed to accommodate as much of this demand as is feasible while at the same time ensuring public safety and protection of the natural environment." Defendant's response expressly acknowledged (as was evident from the draft EIR) that "this is a reduction in parking space availability compared to the existing condition when considering the use of undesignated parking spaces. As a result, there would be an impact to the number of visitor vehicles able to safely park on the project site."

Defendant emphasized the project will have over five times more designated spaces, and is designed to accommodate shuttle service. "Undesignated parking spaces can create traffic safety hazards (including for emergency access) and increase roadside erosion. [The project] balances the need for more parking while recognizing the recreational area's carrying capacity and emphasizing public safety. Group activities for private events and ventures will be encouraged to provide shuttles from off-site locations." Further, the more formalized designated parking spaces "would serve to improve the overall circulation in the area by directing vehicles, including shuttle/bus vehicles to specific areas. The overall safety of vehicular and pedestrian circulation would be improved." The response concluded that: "It is recognized that this number of designated parking spaces will not accommodate maximum demands during peak season/days, which is not the intent of this project. However, the proposed project improves the existing condition, while also protecting public safety and the environment."

### 4. WCA's Certification of the Project

On October 25, 2018, defendant's board held a public hearing and certified the final EIR for the project. Some board members commented on the parking issues. Ms. Chico said, "I'm not familiar with the parking area. I didn't realize, in listening to public comment, that there is no designated official parking and I can't imagine the chaos that goes when people are trying to park. [¶] So I appreciate trying to organize it and create these designated parking areas."

Mr. Uranga said: "So I see here that—or what I saw and I heard from the consultants . . . , they did a traffic study and they did a parking study and they have even made some recommendations about some additional parking that will be provided along the trail to provide greater access to people who want to reach the river, and even making improvements in terms of providing greater access to the river by giving stairs." "So in that respect, I don't see why we would want to stop the project from moving forward, when it's only one issue that's involved here. We're talking about a multimillion-dollar project that involves more access and my question, my issue is access. [¶] And what this project has done and what the consultants have brought forward is actually an enhancement to access for people to enjoy the Emerald Necklace." Board member Mendelsohn said, "I just feel that I have not had adequate time to truly review all of this, to review the responses."

The consultants made a further presentation of the master responses to the public comments, including the master response on traffic and parking. The discussion turned to "the Jones letter," principally to the impact on Mr. Jones's commercial ventures such as bungee jumping at his property on the "Bridge

13

To Nowhere" near the project site.**6** Ms. Chico observed, "It's unfortunate that Mr. Jones wasn't clear in his comments that it was because of a business interest."

The board then voted 4 to 1 to certify the EIR (Ms. Mendelsohn voting no).

## 5.    The Writ Petition Proceedings

On November 28, 2018, plaintiff petitioned for a writ of mandate directing defendant to set aside its approval of the project.

The trial court granted plaintiff's petition in part, concluding: "The project creates (or exacerbates) a parking shortage and, without adequate analysis and evidence of how that shortage would materialize, it cannot be said that the project's parking impacts, direct or secondary, are insignificant."

First, the trial court found deficits in the draft EIR's "parking baseline determinations." The court found there was no substantial evidence to support defendant's determination the maximum number of parking spaces at the site was 417, because the aerial photography on which its consultant relied was not in the record. While plaintiff likewise could not substantiate its claim that the actual maximum number was 473 (as the report it relied on was also missing from the record), the court concluded defendant's error was prejudicial.

---

**6**    Mr. Jones's comments also included a statement that the East Fork Scenic Trail "would eliminate at least 75 much-needed legal roadside parking spaces in the East Fork Scenic Overlook area." Defendant's response, in addition to referring to the master response, was that "[i]t is unclear where these 75 legal parking spaces were derived since the entire project site currently has 48 designated parking spaces."

14

The trial court also found it "alarming" that defendant did not disclose "the particular maximum number of parking spaces available in each area." (The court observed that "parking does not presumably distribute evenly throughout the Project Site," and "[i]f the reduction in parking spaces occurs disproportionately in one popular area of the Project Site, e.g., the East Fork Scenic Overlook where a trailhead is located, then this logically could have a significant impact on parking in that area and create downstream recreational effects. The EIR provides no reasonable explanation for not presenting this vital baseline information.")[7]

In addition, the trial court found the Brown study—finding the average number of parked vehicles was 273—did not support the proposed project's 270 parking spaces. This was because the Brown survey was done between 2:30 p.m. and 6:30 p.m., rather than at peak demand hours earlier in the day.[8]

Then the court turned to the parking reduction, and agreed with plaintiff the EIR failed to serve its informational role. While

_____

[7] The draft EIR stated that "[p]arking within the project site generally concentrates around the Oaks Picnic Area and the East Fork Day Use Parking Area [at the trailhead]. As these locations reach capacity visitors will expand out to surrounding undesignated parking areas."

[8] The draft EIR acknowledged that "parking capacity in the project site is reached early in the day," so the court agreed with plaintiff that an actual vehicle count should have measured parking at peak demand hours. The court concluded: "Thus, no reasonable inference supports the conclusion that a study performed after peak hours would accurately reflect the average number of vehicles at the Project Site."

defendant disclosed the parking reduction, the court found defendant relied on "unreliable and/or inaccurate parking baseline determinations to assess the significance of the Project's impacts on parking. More accurate parking baseline determinations could lead WCA to conclude that the Project's parking impacts are significant and require mitigation." The court cited *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1051 (*Taxpayers*) for the proposition that a parked car has a physical impact on the environment around it that could constitute a significant effect on the environment, and so "the Project's parking reduction could constitute a significant effect on the environment."

The court rejected plaintiff's other contentions, denying the petition as to all other elements of the project. Judgment was entered and a writ of mandate issued on November 14, 2019, ordering defendant to articulate and substantiate an adequate parking baseline for the project, and to reassess the significance of the impacts resulting from the project's parking reduction. These appeals followed.

In a postjudgment order, the court awarded plaintiff $154,000 in attorney fees under the private attorney general doctrine (Code Civ. Proc., § 1021.5). Defendant appealed from that order, and we consolidated the appeals for purposes of argument and decision.

16

**DISCUSSION**

We describe the applicable law, then discuss the parking issue raised in defendant's appeal, and conclude with the remaining issues raised in plaintiff's appeal.

## 1.    CEQA Principles and the Standard of Review

A comprehensive discussion of CEQA and the purposes and role of an EIR appears in *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–393 (*Laurel Heights*).  Suffice it to say that, before approving a project, the lead agency—here, WCA—must find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits.  (*Id.* at p. 391, citing §§ 21002, 21002.1 & 21081.)  "If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees." (*Laurel Heights,* at p. 392.)

In an action to set aside an agency's decision under CEQA, the court's inquiry extends only to whether there was a prejudicial abuse of discretion.  Abuse of discretion occurs if the agency has not proceeded in a manner required by law, or if its decision is not supported by substantial evidence.  The court passes only upon the EIR's sufficiency as an informative document, not upon the correctness of its environmental conclusions.  (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)

CEQA Guidelines, which implement the provisions of CEQA, "define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even

17

though other conclusions might also be reached.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 393, quoting CEQA Guidelines, § 15384, subd. (a).) Courts "should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights,* at p. 391, fn. 2.)[9]

*Laurel Heights* cautions that a court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393.) CEQA's purpose is to compel government to make decisions with environmental consequences in mind, but CEQA " 'does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " (*Laurel Heights*, at p. 393.) Technical perfection in an EIR " ' "is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure." ' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 979.)

The appellate court's inquiry is the same as that of the trial court. The appellate court reviews the administrative record independently to determine whether defendant complied with CEQA or made determinations that were not supported by substantial evidence. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 912; see also § 21168.) "The burden of showing that the EIR is

---

[9]     All references to "Guidelines" are to the current CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.).

18

inadequate is on the party challenging the EIR." (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1562.)

## 2.    The Parking Issue (Defendant's Cross-appeal)

Plaintiff's opening brief tells us that "the centerpiece of the project" is an "intentional reduction in parking" devised by defendant's staff to "severely constrain the public's access to the [San Gabriel Mountains National] Monument and force them to recreate elsewhere." The draft EIR, plaintiff says, "glossed over" this plan and "misled" most of the public "into believing that the project was going to increase existing parking instead of decreasing it."

That is not true. The notion that the "centerpiece" of the project is an intentional reduction in parking is utterly absurd. Nor does the draft EIR—quoted at length above—"gloss over" the reduction in parking. The draft EIR clearly informs the decision-maker and the public that the project reduces parking—according to defendant, from 417 designated and undesignated spots to 270 designated spots (and according to plaintiff, from 473 rather than 417). As explained below, we consider unimportant the discrepancy between 417 versus 473 spots in the context of this case.

We likewise reject plaintiff's other assertions of CEQA violations related to the reduction in parking. In our view, the nature of this project, the applicable law, and the information disclosed in the draft EIR support the conclusions that defendant proceeded as required by law, and the EIR is sufficient as an informative document. Defendant disclosed the reduction in parking, and properly found the proposed project "would have less than significant impacts on recreation." That is all it was required to do.

19

We find it strange that plaintiff attacks the EIR for not converting more wilderness open space to parking or, alternatively, for not continuing to permit parking in fragile natural areas that have become degraded by erosion, trash, and habitat trampling. Since when was environmental protection focused on promoting and expanding parking in protected wilderness monuments? Plainly, reducing and formalizing parking spaces in the San Gabriel River and adjacent canyon recreation areas will protect and restore the environment. Plaintiff has identified *no adverse physical impact on the environment* that results from the reduction in parking, much less a "potentially substantial, adverse change in any of the physical conditions within the area affected by the project." (Guidelines, § 15382.) Nor has plaintiff proffered evidence of any secondary adverse environmental effects of reduced parking, such as on traffic or air quality at the project site.

We agree with the principle stated in *San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656 (*San Franciscans*): "The social inconvenience of having to hunt for scarce parking spaces is not an environmental impact; the secondary effect of scarce parking on traffic and air quality *is*. Under CEQA, a project's social impacts need not be treated as significant impacts on the environment. An EIR need only address the *secondary physical* impacts that could be triggered by a social impact." (*San Franciscans,* at p. 697, citing Guidelines, § 15131, subd. (a).)

*San Franciscans* involved a massive redevelopment project in downtown San Francisco to provide office, retail, hotel, entertainment, and restaurant space in place of abandoned buildings that had been vacant and deteriorating for a decade.

20

(*San Franciscans, supra,* 102 Cal.App.4th at pp. 666, 669–670.) Among other things, the plaintiffs contended the project would have significant impacts "in the form of increased gridlock and traffic pressure and the demand for at least 1,250 new parking spaces," and failed to identify or propose any mitigating measures for those impacts. (*Id.* at pp. 695–696.) The project was located at a transit hub; the EIR pointed out that providing additional off-street parking would have the adverse environmental impact of attracting more cars to the area, in conflict with the city's policy of encouraging use of public transit. (*Id.* at pp. 696–697.)

*San Franciscans* found the EIR "correctly concluded that '[p]arking shortfalls relative to demand are not considered significant environmental impacts in the urban context of San Francisco. Parking deficits are an inconvenience to drivers, but not a significant *physical* impact on *the environment.*'" (*San Franciscans, supra,* 102 Cal.App.4th at p. 697.) The EIR fulfilled its purpose "by identifying ways in which the secondary *environmental* impacts *resulting from* the projected parking deficits could be mitigated." (*Ibid.*)

*San Franciscans* involved an urban setting, whereas this case involves a wilderness setting, but the same principle applies in both cases. Parking deficits are always inconvenient for drivers, but they do not always cause a significant adverse physical impact *on the environment.* Plaintiff does not discuss *San Franciscans,* and relies (as did the trial court) on the *Taxpayers* case. *Taxpayers* rejected the proposition that a parking shortage "can never constitute a primary physical impact on the environment." (*Taxpayers, supra,* 215 Cal.App.4th at p. 1051.) We agree that in some circumstances, parking deficits can have a significant adverse impact on the environment.

21

The project in *Taxpayers* was for the installation of new stadium field lighting and other improvements at a high school, allowing evening sporting events that would attract visitors to a bedroom community where the residents already had to deal with problems caused by illegal parking on the narrow streets during daytime events. (*Taxpayers, supra,* 215 Cal.App.4th at pp. 1021, 1023, 1047.) The school district approved the project, and the trial court dismissed the plaintiff's CEQA cause of action. (*Id.* at pp. 1023–1024.) The Court of Appeal concluded there was "substantial evidence to support a fair argument that the Project may have a significant impact on parking and thus the environment," so an EIR was required. (*Id.* at pp. 1053, 1054.) The evidence included letters from many residents expressing concerns the project would adversely affect the availability of street parking in a neighborhood "landlocked by canyons" with narrow streets, with parked cars during school events illegally blocking driveways, crosswalks, and so on. (*Id.* at pp. 1047, 1053–1054.) The court found the school district "did not have sufficient information relating to the Project's impact on parking and therefore could not adequately consider the potential significance of the Project's impact on parking." (*Id.* at p. 1054.)

*Taxpayers* rejected the school district's reliance on *San Franciscans,* disagreeing "with the broad statement made in [*San Franciscans*] that a parking shortage is merely a social inconvenience and can never constitute a primary physical impact on the environment. [C]ars and other vehicles are physical objects that occupy space when driven and when parked. Therefore, whenever vehicles are driven or parked, they naturally must have some impact on the physical environment. The fact that a vehicle's impact may be only temporary (e.g., only

22

so long as the vehicle remains parked) does not preclude it from having a physical impact on the environment around it. Therefore, as a general rule, we believe CEQA considers a project's impact on parking of vehicles to be a physical impact that could constitute a significant effect on the environment." (*Taxpayers, supra,* 215 Cal.App.4th at p. 1051.)

It seems clear from both *San Franciscans* and *Taxpayers* that "the circumstances of [the] case" (*Taxpayers, supra,* 215 Cal.App.4th at p. 1052) are determinative. The project in *San Franciscans* would attract crowds downtown without providing parking for the people who might prefer to drive, but the parking deficits would have the environmentally desirable effect of increasing reliance on mass transit. In contrast, the project in *Taxpayers* would attract out-of-area evening crowds to a suburban neighborhood with narrow streets where residents would have a hard time finding parking when they returned home at the end of the day. This project in the Angeles National Forest would better manage the heavy recreational use by designating parking near picnic areas, restrooms and trash bins, and also protect the wilderness from further erosion and other damage caused by vehicles parking throughout the site, and by people leaving behind their trash and polluting the water in areas not designated for parking. The parking reduction here may have an adverse social impact for those who must recreate elsewhere, but it will prevent further adverse physical impacts on the environment.

The CEQA Guidelines in Appendix G list more than 20 potential environmental factors that may affect a project's environmental review. Parking availability has not been on the list since 2009. The California Natural Resources Agency

23

explained the deletion of the question related to parking adequacy from Appendix G, in a statement of reasons for amendments to the CEQA Guidelines on greenhouse gas emissions:  "The Natural Resources Agency is aware of no authority requiring an analysis of parking adequacy as part of a project's environmental review.  Rather, the Agency concurs with the court in the *San Franciscans* case that inadequate parking is a social impact that may, depending on the project and its setting, result in secondary effects.  Consistent with existing CEQA Guidelines section 15131(a), deletion of the parking adequacy question from Appendix G checklist will ensure that [']the focus of the analysis shall be on the physical changes.' Specifically, the Appendix G checklist contains questions asking about possible project impacts to air quality and traffic."[10]  The agency's statement lends further credence to the point that parking as an environmental factor is dependent "on the project and its setting." [11]

---

[10]     The agency concluded:  "In sum, nothing in the CEQA statute, or cases interpreting that statute, require an analysis of parking demand.  Further, parking supply is not a reasonable proxy for direct physical impacts associated with a project because parking supply may in some circumstances adversely affect air quality and traffic while in other circumstances, it may create air quality and traffic benefits.  Thus, maintaining the parking question in the general Appendix G checklist is not necessary to effectuate the purposes of the CEQA statute."

[11]     Since 2014, CEQA has expressly provided that parking impacts are not significant in certain urban contexts.  (§ 21099, subd. (d)(1) ["Aesthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a transit priority area shall not be considered

24

Plaintiff's other arguments are colored by plaintiff's repeated formulation of the issue as "impacts on parking" rather than impacts of reduced parking on the environment.

Much of plaintiff's brief is devoted to an attempt to show defendant "*concealed* the Project's impacts on parking by subtracting disclosures of this fact" from the EIR. The trial court correctly rejected this claim, finding the draft EIR disclosed the parking reduction and analyzed it, also observing the reduction "is implicit throughout the Recreation Section."

Plaintiff next contends defendant did not properly disclose "baseline parking conditions."[12] Plaintiff contends, and the trial court agreed, there is no evidence in the record supporting defendant's determination that the maximum number of parking spaces currently at the project site is 417.

Plaintiff relied on the Sugden recreation report (which formed the basis for the draft EIR recreation section) to assert to

---

significant impacts on the environment."].)  See also *Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 728 ("the Legislature endorsed the approach of . . . *San Franciscans* for urban infill projects near transit hubs . . . .  While secondary parking impacts caused by ensuing traffic congestion ('air quality, noise, safety, or any other impact associated with transportation') must be addressed, parking impacts, in and of themselves, are exempted from CEQA review for these projects," quoting § 21099, subd. (b)(3)).

[12]    "An EIR must include a description of the physical environmental conditions in the vicinity of the project.  This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."  (Guidelines, § 15125, subd. (a).)

the trial court that the actual maximum number of parking spaces is 473.  But, as the trial court pointed out, there is no evidence in the record supporting the Sugden number either. Both estimates (417 and 473) were based on aerial photography missing from the record.

We find it immaterial whether the maximum number of parking spaces is currently 417, or 473, or some number in between.  Plaintiff insists the EIR "failed to provide a *true* baseline for the Project's impacts on parking."  But again, it is not the project's "impacts on parking" that matter; it is the impact of the project's reduced parking *on the environment* that matters. Whether that reduction is 203 fewer spaces (473 to 270) or 147 fewer spaces (417 to 270) has no impact *on the environment* unless the 57–space difference would result in significant deterioration of other recreational facilities in the area.  Given the large regional area, the number of facilities available (eight, see *post*), and the small difference in the estimates, it would be irrational to conclude there would be any significant deterioration of those other facilities.

The EIR identifies eight "major recreation facilities with similar activities" located within approximately 25 driving miles to the project site.  Plaintiff challenges the EIR's assumption that reduced parking would likely lead to increased use at other recreation areas in the region.  The trial court also criticized the "undue assumption that the parking reduction would lead to increased use of other areas with similar amenities within the region."  The trial court referred to the National Visitor Use Monitoring survey for the Angeles National Forest, described in footnote 4, *ante.*  The court concluded the survey was of "dubious value," because it is "unclear" on whether those visitors who "had

26

already traveled to [the San Gabriel Mountains] to recreate would immediately 'travel somewhere else to participate in their main activity.'" Further, the survey "does not account for the 48% of other visitors who presumably would still attempt to recreate at" the project site.

We do not agree that visitors who cannot find a place to park "presumably would still attempt to recreate" at the site, or that they must be "account[ed] for." Plaintiff says people will not "just turn around and go elsewhere" when there is no place to park, and instead "will circle and idle, hoping to catch a space being vacated before someone else does." Certainly, some people may do so, but plaintiff's claim this will become herd behavior at the site is unsubstantiated speculation. (See Guidelines, § 15384, subd. (a) ["Argument, speculation, [or] unsubstantiated opinion or narrative . . . does not constitute substantial evidence."].)

On the contrary, it was reasonable for defendant to assume that a potential secondary effect of a reduction in parking in a wilderness area is that visitors who cannot park there would go elsewhere, and that demand on alternative recreational areas could potentially have a physical impact on those facilities. Appendix G of the CEQA Guidelines suggests analysis of that very question, and the draft EIR addressed it—concluding there would be no substantial physical deterioration (or acceleration of deterioration), because displaced visitors would be dispersed across a large region. That is a rational conclusion, and plaintiff offers no rational basis for a contrary conclusion.

3. **Plaintiff's Appeal**

Plaintiff contends the EIR's analysis of alternatives to the project violated CEQA, and in addition the EIR failed to analyze

27

the project's alleged conflicts with certain land use policies. These contentions have no merit.

### a. The Alternatives Issue

#### i. The law

The principles governing analysis of alternatives to a project are described in *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143 (*Bay-Delta*). "CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts. [Citations.] The CEQA Guidelines state that an EIR must 'describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project . . . .' " (*Id.* at p. 1163, quoting Guidelines, § 15126.6, subd. (a).) "An EIR need not consider every conceivable alternative to a project or alternatives that are infeasible." (*Bay-Delta,* at p. 1163.)

" 'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.' " (*Bay-Delta, supra,* 43 Cal.4th at p. 1163, quoting Guidelines, § 15126.6, subd. (a).) "The rule of reason 'requires the EIR to set forth only those alternatives necessary to permit a reasoned choice' and to 'examine in detail only the ones that the lead agency determines could feasibly attain most of the basic objectives of the project.' " (*Bay-Delta,* at p. 1163, quoting Guidelines, § 15126.6, subd. (f).)

#### ii. The draft EIR

Here, the draft EIR fully analyzed only two alternatives: the project and "no project." (The Guidelines (§ 15126.6, subd. (e)(1)) require evaluation of a "no project" alternative.) The

draft EIR explained how defendant arrived at these two alternatives.

A series of planning workshops were held in 2014 and 2015 to solicit input from an advisory committee.  The committee included conservation and environmental organizations, regulatory agency staff, United States Forest Service technical experts, and WCA consultants.  A consultant prepared three design concepts based on input from the first two workshops, each with a particular focus (public access, river path, and low impact development).  The intent of the alternatives was "to demonstrate a range of design interventions that could meet the project objectives."  The three design concepts were presented at a third planning workshop.

The project design that developed is a "hybridized design alternative" that "includes components from each of the three concepts initially developed by BlueGreen [the consultant] as a preferred design to meet the project objectives.  In [contrast] to the Public Access and River Path Design Alternative, recreational use is concentrated.  In differentiating from the Low Impact Development Design Alternative, there is a higher emphasis on recreational facilities and infrastructure.  An administrative site type modification was added to prioritize day use recreation to further meet the project objectives."

The draft EIR explains that alternatives "were assessed for their ability to reasonably achieve the purpose and need and reduce environmental impacts."  (See fn. 2, *ante,* recounting the stated purpose and need.)  "Based on the screening criteria," defendant selected Alternative 1 (the project) and Alternative 2 (no action) for detailed analysis in the EIR.

The EIR also describes "alternatives considered but eliminated from full analysis." This consisted of a "forest closure alternative" suggested by the California Department of Fish and Wildlife. This alternative would have closed "all or a portion of the project site to adequately protect biological resources during the breeding season of the Santa Ana sucker (March 1 through August 1)." The draft EIR describes the reasons for eliminating this alternative from full analysis, including that recreation use would be restricted during the time of year when most use currently occurs.

### iii.    Plaintiff's contentions

Plaintiff contends CEQA, the Guidelines, and Supreme Court case law require an EIR to analyze more than the "no project" alternative. That is not correct.

Plaintiff's first argument is that CEQA and the Guidelines consistently use the plural ("alternatives") rather than the singular. This point is unconvincing, given the rule of reason required by the Guidelines and confirmed by the Supreme Court, telling us the EIR must " 'set forth only those alternatives necessary to permit a reasoned choice' " and that " 'could feasibly attain most of the basic objectives of the project.' " (*Bay-Delta, supra,* 43 Cal.4th at p. 1163; see also *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566 "[[e]ach case must be evaluated on its facts," and CEQA establishes "no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR"].)

Two courts have rejected the contention that an EIR must, as a matter of law, analyze more alternatives than the no project alternative. The court in *San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018)

30

26 Cal.App.5th 596 stated:  "To the extent [the plaintiff] would have us conclude, as a matter of law, that consideration in the EIR only of a proposed project and a no project alternative is inadequate, we reject that contention.  As explained in *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184 (*Mount Shasta*), in response to a similar claim, 'there is no rule specifying a particular number of alternatives that must be included.  "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR.  Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose." ' "  (*Id.* at p. 633, quoting *Mount Shasta, supra*, at p. 199.)

Plaintiff claims *Mount Shasta* is an "outlier," and relegates *San Franciscans for Livable Neighborhoods* to a footnote.  But there are no precedents that disagree with the principle stated in those cases, and we agree with both of them.

Plaintiff then argues that, even if analysis of only a "no project" alternative is permissible, it is not permissible under the specific facts of this case.  That contention has no merit either.

Plaintiff tells us, correctly, that "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects." (§ 21002.)  Then plaintiff asserts the record shows defendant "was presented with several feasible alternatives to the Project" that defendant should have analyzed in the EIR.  These consist of 5 one-sentence alternatives listed in the comments from Mr. Jones, owner of the Bridge to Nowhere, whose vested interest

31

in the impact of the project on his business was noted by defendant's board member Ms. Chico.

Mr. Jones's suggested alternatives were: "1.  Increasing public access to a dispersed area of the Monument;  [¶] 2.  Preserving natural resources through a combination of enforcement and public education about high impact behaviors, and encouraging low impact behaviors;  [¶]  3.  Providing greater public access with increased public parking in the East Fork Overlook area [parking for the Bridge to Nowhere is in this area]; [¶]  4.  Funding through government appropriations and philanthropic sources for the upkeep of improvements rather than construction of new improvements, and a cost-benefit analysis of same; and  [¶]  5.  Providing for parking replacement during construction, and placing the parking phase last to minimize the parking impacts during construction of other improvements."

From Mr. Jones's perspective, these alternatives are fine ideas that would help grow his business, save taxpayer dollars, and use park rangers and education to reduce environmental impacts.  But CEQA " 'does not require that an agency consider specific alternatives that are proposed by members of the public or other outside agencies.' " (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 345 (*South of Market*).)  "Rather, [an agency is] responsible for selecting a range of project alternatives that could feasibly accomplish most of the basic objectives of the project and could avoid or lessen one or more of its significant impacts." (*Ibid.*)  As we have already said, the necessary range is governed by a rule of reason " 'that requires the EIR to set forth

32

only those alternatives necessary to permit a reasoned choice.' " (*Ibid.*)

Further, "[c]ourts will defer to an agency's selection of alternatives unless the petitioners (1) demonstrate that the chosen alternatives are ' " 'manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives,' " ' and (2) submit evidence showing the rejected alternative was both 'feasible' and 'adequate,' because it was capable of attaining most of the basic objectives of the project." (*South of Market, supra,* 33 Cal.App.5th at p. 345.)

Here, the project's intent is "to provide recreational improvements and ecological restoration," focusing "on reducing impacts along the most heavily used section of the river." Plaintiff has not shown it is "manifestly unreasonable" to analyze only the project and the "no project" alternative. Nor has plaintiff submitted any evidence, or even any argument, to show that the "alternatives" it suggests "were capable of attaining most of the basic objectives of the project." (*South of Market, supra,* 33 Cal.App.5th at p. 345.) Nor has plaintiff explained how any of the alternatives would "avoid or lessen one or more of [the project's] significant impacts." (*Ibid.*) As the WCA board found, no significant impacts were identified that could not be avoided or reduced to a less than significant level.

The trial court put it this way: "WCA undertook extensive [pre-draft EIR] initiatives to adequately design a Project that would meet its stewardship and recreational goals. WCA analyzed environmental effects caused by the Project and concluded that none were significant. WCA then analyzed the Project and the no project alternative in detail. Under these circumstances, in particular the nature of the Project and its

demonstrably small effect on the environment, the Court agrees with WCA that consideration of other project alternatives was unnecessary."

"[I]t is [the plaintiff's] burden to demonstrate inadequacy of the EIR. [A plaintiff] must therefore show the agency failed to satisfy its burden of identifying and analyzing one or more potentially feasible alternatives." (*Mount Shasta, supra,* 210 Cal.App.4th at p. 199; see *ibid.* ["Absent a showing that the EIR failed to include a particular alternative that was potentially feasible or that, under the circumstances presented, including only the Project and the 'No Project' alternatives did not amount to a reasonable range of alternatives, plaintiffs' challenge to the alternatives analysis fails."].) That is the case here.

### b. Consistency with land use plans

Appendix G of the CEQA Guidelines contains this question: "Would the project . . . [c]ause a significant environmental impact due to a conflict with any land use plan, policy, or regulation adopted for the purpose of avoiding or mitigating an environmental effect?"

The draft EIR's discussion of land use and planning covers both the Angeles National Forest Land Management Plan (LMP) and President Obama's designation of the national monument (proclamation 9194). The draft EIR states that the planning effort for the project was concurrent with the monument plan and was "consistent with both the existing [Angeles National Forest] LMP and the Monument Plan direction."

Plaintiff contends that, to the contrary, there are "glaring land use conflicts." The project's "drastic reduction in public parking is at loggerheads with Proclamation 9194's unambiguous objective to *facilitate* the ever-growing ranks of Angelinos [*sic*] in

recreating in the San Gabriel Mountains National Monument." The trial court rejected this claim, and we do, too.

Proclamation 9194, after an extensive description of the San Gabriel Mountains and their history (including that the lands "provide invaluable backcountry opportunities for the rapidly expanding nearby communities and also provide habitat for iconic and endangered species"), states it is in the public interest "to preserve and protect the objects of scientific and historic interest at the San Gabriel Mountains." The president therefore proclaimed "the objects identified above that are situated upon" lands owned by the United States to be the national monument, "for the purpose of preserving those objects." It repeatedly requires "the proper care and management of the objects protected by this proclamation." It requires a management plan for the monument that "shall provide for protection and interpretation of the scientific and historic objects identified above and for continued public access to those objects, consistent with their protection."

We find the project is entirely consistent with the policies enunciated in the proclamation. Plaintiff elevates public access for recreation above all other objectives of the proclamation. Certainly, the proclamation calls "for continued public access to those objects," but "consistent with their protection." Plaintiff completely ignores the latter phrase.

As the trial court pointed out, the project proposes "to protect and restore the existing multi-use areas for public enjoyment" by developing "new picnic areas, pedestrian trails, river access points and upgrades to existing facilities, improvements to paved and unpaved roadways, and restoration of riparian and upland vegetation communities of the [river] and

35

Cattle Canyon Creek." These improvements comport with the objective of continued public access, consistent with the protection of the wilderness being accessed, and they further as well the overall objective "to preserve and protect the objects of scientific and historic interest at the San Gabriel Mountains."

Plaintiff also contends the project is inconsistent with the Angeles National Forest LMP because it limits recreational use, while the LMP calls for implementation of other management actions (such as conservation education) before direct action limiting visitor use. Defendant responded to plaintiff's claim in the final EIR, pointing out that "one of the purposes of the project is to 'provide recreation facilities and infrastructure that are high quality, well-maintained, safe, and accessible to visitors.'" Defendant concluded the project "does not restrict public access to the Monument; rather, it provides for both new and improved recreation facilities and amenities to visitors."

The trial court found no inconsistency between the project and the LMP, observing: "[Plaintiff] points to no evidence that the Project would actually eliminate recreational use of the Project Site. To the contrary, the Project's features are designed 'to protect and restore the existing multi-use areas for public enjoyment' by implementing sustainability actions. Overall, the Project is consistent with and furthers this LMP policy."

We agree with the trial court's assessment.

4.      **The Attorney Fee Award**

Our disposition of the parties' appeals on the merits compels reversal of the trial court's award of attorney fees to plaintiff.

## DISPOSITION

The judgment granting a peremptory writ of mandate is reversed and the cause is remanded with directions to enter a new judgment denying the petition for writ of mandate in its entirety.  The order awarding attorney fees is reversed. Defendant shall recover its costs on appeal.


GRIMES, Acting P. J.

WE CONCUR:


STRATTON, J.


WILEY, J.